### In re Ian TAYLOR, Relator.

No. 14–09–00548–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 20, 2009.

---

6. *See id.*

7. *Ex parte Banks,* 769 S.W.2d 539, 540 (Tex. Crim.App.1989).

Steven L. Roberts, David A. Baay, Houston, for Relator.

Harry L. Tindall, Steve A. Kamel, Randall B. Wilhite, Houston, for Real Party in Interest.

Panel consists of Chief Justice HEDGES, and Justices BROWN and BOYCE.

## OPINION

WILLIAM J. BOYCE, Justice.

Ian Taylor filed a petition for writ of mandamus challenging the trial court's denial of Taylor's motion to quash a deposition. *See* Tex. Gov't Code Ann. § 22.221 (Vernon 2004); *see also* Tex.R.App. P. 52. Because we conclude that the real party in interest, Leticia Loya, met the standard for an apex deposition established under *Crown Central Petroleum Corporation v.*

*Garcia,* 904 S.W.2d 125 (Tex.1995), we deny relief.

## Background

This deposition dispute arises from a divorce proceeding between Miguel and Leticia Loya. As part of the divorce, Miguel and Leticia are conducting an inventory of assets in the marital estate. One of these assets is stock awarded to Miguel, who is the president of Vitol, Inc. Leticia seeks to depose Taylor regarding valuation of this stock.

Vitol, Inc. is one of more than 50 companies that constitute the Vitol Group, a privately owned business that engages in petroleum distribution and trading. The Vitol Group also includes entities called the "Tinsel Group" and "Stichting."

Taylor is described as "the 'President' of Vitol." Taylor says this is "an outward facing title that, of itself, confers no special status.... It does, however, mean that I am the public face of Vitol and play an important role in business development and client relationships for the group." Taylor states that he is employed by Vitol Broking Limited, and is a member of the board of directors of Vitol Holding BV and Vitol Holding II SA. All three entities are part of the Vitol Group. Miguel also is one of seven members of Vitol Holding II SA's board of directors. According to Taylor, the Vitol Group as a whole is managed by Vitol Holding II SA's board of directors.

The Vitol employees who are United States citizens formed the Tinsel Group for tax purposes. Leticia seeks to depose Taylor regarding valuation of Miguel's stock held by the Tinsel Group, and other shares that were placed in a trust for their children.[1]

---

1. The trust formed by Miguel is called the "Nova Trust." Another trust for the Vitol shareholders' children is called Planck Investments, L.P.

Leticia's counsel filed a Motion for Issuance of Letters of Request in Texas state court, which the trial judge signed. On January 19, 2009, the High Court of Justice, Queen's Bench Division, acted on the Letter of Request. That court ordered Taylor's deposition to proceed in London, where Taylor lives, and limited Taylor's deposition to the following areas:

1) The nature and value of the Loyas' shares of Vitol stock already issued and anticipated to be issued including the most up to date information available as to financial performance in the years ended 31 December 2007 and 31 December 2008

2) The relationships between the various Vitol, Stichting, and Tinsel entities who are nominees of such shares, in order to understand the incidents and security of such property

3) How, when, and why certain classes of stock have been reclassified by the Vitol, Stichting, or Tinsel entities

4) The difference in the various classes of stock

5) The factors which will determine when and for how much each of the share classes may pay dividends or be redeemed

6) The respondent's power, as President of Vitol, Inc., to influence decisions concerning the issuance of stock, redemption of stock, and payment of dividends on the various share classes[.]

On February 16, 2009, Taylor filed a motion to quash in the Texas trial court on grounds that the deposition is an impermissible apex deposition. On February 19, 2009, the High Court of Justice, Queen's Bench Division, stayed Taylor's deposition pending a decision in Texas state court on the motion to quash.

After hearings on April 3 and May 19, 2009, the trial judge denied Taylor's motion to quash and signed an order to that effect on May 19, 2009. Taylor now seeks mandamus relief from the trial court's order denying the motion to quash his deposition.

**Mandamus Standard**

■ Mandamus relief is available to correct a clear abuse of discretion when there is no adequate remedy at law. *In re Team Rocket, L.P.,* 256 S.W.3d 257, 259 (Tex. 2008) (orig. proceeding); *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992) (orig. proceeding).

With respect to the resolution of fact issues or matters committed to the trial court's discretion, a reviewing court may not substitute its judgment for that of the trial court. *Walker,* 827 S.W.2d at 839. On the other hand, a trial court has no discretion in determining the law or in applying the law to the facts. *E.g., Huie v. DeShazo,* 922 S.W.2d 920, 927–28 (Tex. 1996) (orig. proceeding). Thus, a clear failure to analyze or apply the law correctly will constitute an abuse of discretion. *Id.*

■ Mandamus is an appropriate remedy when a trial court allows an apex deposition to go forward in violation of the standard governing such discovery. *E.g., In re BP Prods. N. Am., Inc.,* No. 01–06–00613–CV, 2006 WL 2192546, at *2–3 (Tex. App.-Houston [1st Dist.] Aug. 4, 2006, orig. proceeding) (mem. op.).

**Analysis**

■ The standard governing apex depositions originates in *Crown Central Petroleum Corporation,* 904 S.W.2d at 128. The *Crown Central* guidelines apply "[w]hen a party seeks to depose a corporate president or other high level corporate official and that official (or the corpo-

ration) files a motion for protective order to prohibit the deposition accompanied by the official's affidavit denying any knowledge of relevant facts. . . ." *Id.*

■ The trial court first must determine whether the party seeking the deposition "arguably [has shown] . . . that a high level official has unique or superior personal knowledge of discoverable information." *In re Daisy Mfg. Co.,* 17 S.W.3d 654, 656 (Tex.2000) (orig. proceeding) (per curiam) (citing *Crown Cent.,* 904 S.W.2d at 128). If the party seeking the deposition does not make this showing, the trial court must " 'first require the party seeking that deposition to attempt to obtain the discovery through less intrusive methods.' " *Id.* (quoting *Crown Cent.,* 904 S.W.2d at 128). "The discovering party may thereafter depose the apex official if, after making a 'good faith effort to obtain the discovery through less intrusive methods,' the party shows that (1) there is a reasonable indication that the official's deposition is calculated to lead to the discovery of admissible evidence, and (2) the less-intrusive methods are unsatisfactory, insufficient or inadequate." *Id.* at 657 (quoting *Crown Cent.,* 904 S.W.2d at 128); *see also In re Alcatel,*

11 S.W.3d 173, 176 (Tex.2000) (orig. proceeding).

## I. Applicability of the *Crown Central* Test

■ We first must determine whether this is an apex deposition situation. Taylor asserts that he is not a director, officer or employee of the companies or entities identified in the deposition request except for Vitol Holding BV and Vitol Holding II SA. He further states that, although he is described as the "President" of Vitol, this is an "outward facing title" and he is merely the "public face" of Vitol. Based on these statements, Leticia argues that Taylor negated his claimed apex status. We are unpersuaded by this argument. Although he attempts to downplay his job responsibilities, Taylor states that he is a director of certain Vitol entities and "President" of Vitol. Taylor qualifies a "high level official" on this record.

■ Next, we address the state of Taylor's knowledge. Taylor did not completely disclaim "any" knowledge of relevant facts. Instead, Taylor disclaimed knowledge of certain particulars and stated that three other individuals have more knowledge regarding "the Tinsel entities" than does Taylor.[2] Leticia contends that

---

2. Taylor's affidavit, attached to his motion to quash, included the following assertions:

> Furthermore, I am not Mr. Loya's 'line manager' and Mr. Loya does not report to me. Moreover, I am not directly involved in the management of the U.S. elements of Vitol (which is Mr. Loya's area of responsibility) or in the separate shareholding structures that relate to the U.S. elements of Vitol. These are all matters for U.S. shareholders, of which Mr. Loya is one. Mr. Loya does not report to any one individual within the Vitol organisation in particular.
> 　　　*　　*　　*
> Also, I would like to make it clear that I have no interest of any kind (direct or indirect) in either of the Tinsel entities referred to in the Letter of Request. In fact, I know very little about these entities other than

that they have been established by and for U.S. shareholders in Vitol.

　　　*　　*　　*

As regards the request that I be deposed:
I understand that I will, apparently, be asked about relationships between various Vitol companies, with the primary focus being on the Tinsel entities. As I have already said, however, I have no involvement in these entities. Accordingly, if the Tinsel entities are intended to be a focus of the deposition, I am, quite simply, the wrong person to appear as a witness;
There are at least three individuals in the U.S. who are likely to know far more than me about the Tinsel entities because they have, I believe, been involved in the establishment and operation of the Tinsel struc-

Taylor cannot invoke the *Crown Central* apex standards because he has not disclaimed "any" knowledge of relevant facts. We agree with Taylor that *Crown Central* does not require apex officials to assert total ignorance of all possible facets of a controversy. *See In re BP Prods. N.A., Inc.,* 2006 WL 2192546 at * 4 (citing *Alcatel,* 11 S.W.3d at 179).

■ Additionally, Leticia argues that *Crown Central* should not apply because Miguel identified Taylor in discovery responses as a person with knowledge of relevant facts. Miguel's characterization of Taylor is not dispositive.[3] This is not a situation in which the "Vitol Group" or an individual Vitol entity listed Taylor as a fact witness in litigation being conducted by that entity. Miguel is litigating his own divorce on his own behalf. Miguel's characterization of Taylor in connection with Miguel's divorce does not constitute an admission by the "Vitol Group," a particular Vitol entity, or Taylor himself regarding the state of Taylor's knowledge.

Based on the assertions in Taylor's affidavit, we conclude that Taylor is a "high-level official" who has denied "unique or superior knowledge of discoverable information." *See In re Daisy Mfg. Co.,* 17 S.W.3d at 656.

## II. Determining Whether the *Crown Central* Standard Has Been Satisfied

■ Having determined that the apex deposition standard applies here, we now examine whether Leticia satisfied that standard so as to permit Taylor's deposition. We first address whether Leticia established that Taylor arguably has unique or superior knowledge of discoverable information. *See Crown Cent.,* 904 S.W.2d at 128. We conclude that she has done so on this record.

Miguel's Vitol Holding II SA shares were converted into Tinsel Group shares in 2006. Tinsel also owns shares in Vitol Holding II SA. Accordingly, two shareholder agreements are relevant to Miguel's stock ownership. They are the Vitol Holding II SA Shareholder's Agreement and the Tinsel Group Shareholder Agreement. The agreements contain similar provisions. Article 6.1 of each agreement identifies certain "termination events" under which the shareholder is "deemed" to have offered his respective shares for sale back to the company. Divorce is one such "event."[4] Under Article 7.1 of each agreement, each respective board "may, at its sole discretion, decide to redeem all or part of the Shares. The proceeds of the sale or redemption, as appropriate, shall

---

ture; they are Mr Loya himself, Mr Jeff Hepper and Mr Keith Swaby. All three are based in Houston, Texas. Furthermore, two of these individuals—Mr Loya and Mr Hepper—are of equal seniority to me within the Vitol organisation and will have the same degree of knowledge about the organisation as a whole. . . .

3. Taylor contends the trial judge erred because the trial judge orally denied the motion at the hearing after asking whether Taylor was listed as a person with knowledge of relevant facts and learning that he was so listed. The order denying the motion to quash does not specify any grounds. Accord-

ingly, we address application of the *Crown Central* test.

4. In addition to a shareholder's divorce, other "termination events" include bankruptcy; judicial suspension of payment; death of a shareholder who is a natural person; disability; the dissolution or liquidation of a shareholder that is not a natural person; any attachment levied on shares held by a shareholder; a change of ownership of shares that occurs otherwise than by transfer; a shareholder's loss of free control or free disposal his shares; and termination of the shareholder's employment with Vitol Group or Tinsel for any reason.

be the percentage of the intrinsic value of each Share" as determined by a formula established in the shareholder agreements.[5]

Thus, the Loyas' divorce will trigger the liquidation of their interest in the Tinsel shares—the largest asset in the marital estate.[6] Leticia asserts that calculating the value of this stock is complicated by Vitol's status as a private company, and that shares have been transferred between Vitol entities and reclassified. Leticia contends that Taylor's deposition is necessary to determine the true nature and value of Miguel's stock; how future stock distributions will be made; and how future dividends and redemptions will be determined.

Taylor stated in his affidavit that Miguel, Jeff Hepper and Keith Swaby had more or superior knowledge of the Tinsel entities. Leticia has deposed all three. Having reviewed their depositions, we conclude that the trial court acted within its discretion and consistent with *Crown Central* in allowing Taylor's deposition to go forward.

Miguel testified that he is not aware of an instance in which an employee was divorced and the nonemployee spouse was awarded shares in either Vitol Holding II SA or Tinsel Group. Miguel testified that upon termination, the shares would be converted to preferred shares and that, although the stock reflects underlying assets of Vitol, the board of directors has absolute power to make decisions regarding redemption of this stock. Miguel was unaware of any previous situations where Tinsel shares were converted upon a termination event.

Jeff Hepper, who is senior vice president of Vitol, Inc. and is a member of the Vitol Holding II SA board of directors, testified that he is not familiar with the legal structure of Tinsel Group, which holds legal title to Vitol shares. Hepper understood that there are different classes of shares of Tinsel Group, but he "couldn't tell" the difference between the different classes of shares or even what classes of shares he owns. In providing information to the firm that was providing appraisals of Vitol and Tinsel Group, Hepper made an "educated guess" about Vitol's earnings.

Hepper stated that Vitol Holding II SA's board has discretion to determine when to pay dividends or to make share redemptions. In a termination event, the value of the redeemed shares is not discounted in the case of a vested shareholder; he did not know if the value of the redeemed shares held in trust for the children of shareholders is discounted. He did not know of an instance in which a nonemployee spouse has been awarded Tinsel shares in a divorce. The intrinsic value of Leticia's shares would be fixed when the Vitol Holding II SA board deems redemptions. . Hepper did not know if there is a document at Tinsel that governs

---

5. Any common Tinsel shares awarded to Leticia in the divorce will be converted to preferred Tinsel shares. Common shares participate in the appreciation of the company, while preferred shares do not. Dividends are paid on common shares and preferred shares are redeemed or repurchased by the company. It is within the Vitol Holding II SA board's discretion to decide whether to redeem shares. When Vitol Holding II SA redeems its shares owned by Tinsel, it pays Tinsel. In the case of common shares, the Tinsel Group board will decide whether to pay a dividend. In the case of preferred shares, Tinsel redeems its shares based on the redemption value of the underlying Vitol Holding II SA shares.

6. On December 31, 2007, the Loyas' shares and those of the Nova Trust, according to Tinsel, had an intrinsic value of almost $140,000,000; on March 18, 2008, dividends of approximately $12,700,000 were paid on the stock.

how dividends and redemptions from Vitol payments are handled in a termination event, but he "hope[d] so."

Keith Swaby, a current vice president of Vitol, Inc. and former treasurer and chief financial officer of Vitol SA, Inc., testified that he is not aware of anyone in Tinsel who has tendered his shares for redemption without having left the company. Swaby has not been involved in the calculation of the payoff to a nonemployee spouse who was award shares in a divorce. More specifically, in the case of an employee's divorce, he was not familiar with the provisions of the Shareholder's Agreement relating to shares that are awarded to a spouse, and he had no reason to have any knowledge regarding any Vitol employee who may have gone through a divorce whose spouse was awarded shares in Vitol. If Leticia were to be awarded Vitol shares in the divorce, Swaby does not know if such shares would be converted to preferred status or if Leticia would be required to offer them for sale back to Tinsel. However, the Vitol Holding II SA board would be involved in the calculation to pay the divorcing spouse for the redemption of the shares.

With respect to Taylor's knowledge, Swaby testified as follows:

Q. All right. Is it fair to say [Taylor] is the most knowledgeable person on the planet to know about the operations and details of Vitol and all of its various subsidiaries and affiliated companies?

\* \* \*

A. Well, he's knowledgeable in the company, probably not on the specifics of each operation, no.

\* \* \*

Q. (By Mr. Tindall) What individual on earth would know more about Vitol than Ian Taylor?

A. He probably would be a good place to start.

Swaby was not able to identify anyone who has more knowledge of Vitol than Taylor. Swaby further testified that an intrinsic value of shares, or an allocation of retained earnings, is calculated annually, which Taylor then reports to the shareholders:

Q. Once the intrinsic value of one period is determined, is it the company's normal procedure to publicize that, at least to some—some of its employees, to let them know what it is?

A. Yeah, I think there's—there's a—Mr. Taylor issues a note to shareholders from time to time that state[s] either what the actual or estimated earnings are for the year sometime after year-end.

Q. And is there some backup data, some schedule, some documentation supplied that—that—that would back the figure up so that people can check it out for themselves?

A. We believe Mr. Taylor.

Q. So your answer is?

A. No.

As stated above, there is no backup data for Taylor's report on Vitol's earnings. Instead, the shareholders rely solely on Taylor for this information. This testimony supports a determination that Taylor arguably has superior or unique knowledge regarding Vitol's financial performance as it relates to Miguel's stock.

Additionally, the record contains ten letters Taylor sent to Miguel between 2001 and 2008; these include several annual shareholder letters that enclosed statements of intrinsic value for Miguel's Vitol Holding II SA shares for the years 2001 through 2005, and the statements of intrinsic value for Miguel's and Planck's Tinsel

Group shares for 2006 and 2007. The statements of intrinsic value reflect the various classes of shares, the number of shares, prior balance, profit allocation, dividend paid, addition of shares, redemption/sales/reclassification, and year-end balance. Other letters announce the issuance of new Vitol Holding II SA shares; invite Miguel to participate in a specific number of those new shares at a certain price; and advise that Taylor is available to answer any questions.

These circumstances distinguish this case from others in which apex depositions have not been allowed. *See In re El Paso Healthcare Sys.*, 969 S.W.2d 68 (Tex.App.-El Paso 1998, orig. proceeding) (plaintiff was unable to show that CEO's knowledge of understaffing was unique or superior to that of other company officials); *AMR Corp. v. Enlow*, 926 S.W.2d 640, 644 (Tex. App.-Fort Worth 1996, orig. proceeding) (plaintiffs sought CEO deposition regarding policy decisions about alcohol service and flight attendant training; evidence showed no basis for deposing CEO beyond his ultimate responsibility for all corporate decisions). Based on the depositions of Miguel, Hepper, and Swaby, and the letters from Taylor, Leticia has established that Taylor arguably has unique or superior knowledge sufficient to justify his deposition on the specific issues delineated by the High Court of Justice, Queen's Bench Division.

## Conclusion

Based on our review of the record, we hold that Taylor has not established an abuse of discretion by the trial court because Leticia showed that Taylor arguably has unique or superior knowledge about the deposition topics delineated by the High Court of Justice, Queen's Bench Division.

Accordingly, we deny Taylor's petition for writ of mandamus.