# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-14-00091-CV

**In re David Miscavige and Religious Technology Center**

ORIGINAL PROCEEDING FROM COMAL COUNTY

## O P I N I O N

In this original proceeding, relators David Miscavige and Religious Technology Center seek a writ of mandamus from this Court directing the trial court (1) to vacate its order compelling Miscavige's deposition and (2) to conduct a hearing on Relators' special-appearance motions. Relators assert that under the apex-deposition doctrine, real-party-in-interest Monique Rathbun has failed to establish that Miscavige's deposition is appropriate. We conditionally grant Relators' mandamus petition in part and deny it in part.

## BACKGROUND

This case concerns an alleged three-year "harassment campaign" against Monique and her husband Mark Rathbun by certain members and employees of the Church of Scientology.[1] According to Monique's first amended petition, Mark is a former member of the Church who left the organization in 2004 because "he could no longer abide Mr. Miscavige's" alleged abuse of

---

[1] To avoid confusion, we refer to the Rathbuns by their first names. We also refer to the Church of Scientology as "the Church," but we will refer to the various organizations and corporate entities within the Church separately.

other Scientoligists.[2]  In 2009, Mark began speaking "to the national media" about Miscavige's alleged misconduct.  According to Relators, Mark also began "'squirreling'—a term used to describe one who distorts the Scientology scripture and pretends to deliver it in altered form."

In response to these activities, Linda Hamel—the head of the Church's Office of Special Affairs—instructed a team of Church officials and private investigators known as the "Squirrel Busters" to investigate the Rathbuns.  According to Monique, the Squirrel Busters leased a house across the street from the Rathbuns' home and conducted the various surveillance and harassment operations that form the basis of Monique's tort claims.  Furthermore, Monique asserts that Miscavige must have personally authorized the Squirrel Busters' tortious conduct because "[n]o one else in any Scientology organization has the authority to approve such an operation."

The parties disagree about the nature of Miscavige's role within the Church.  Relators assert that Miscavige is "the Church's ecclesiastical leader" and chairman of the board of the Religious Technology Center—a California "non-stock, non-profit corporation" that "holds the ultimate ecclesiastical authority for the pure application of Scientology scripture."  According to Relators, the Religious Technology Center is a strictly separate entity from the Office of Special Affairs—which itself is a division of the Church of Scientology International, a separate non-profit California corporation.

Conversely, Monique asserts that as the "head of [the Religious Technology Center] and the unquestioned ruler of all Scientology organizations," Miscavige was the only person who

---

[2] Both parties raise multiple allegations against each other.  We repeat only those allegations that are relevant to our disposition of the issues in this mandamus proceeding.

could have authorized the Squirrel Busters' activities. In support of this assertion, Monique submitted unsworn declarations from several former Church members. The declarants claimed that based on their personal experiences, the allegedly separate corporate entities within the Church all answer directly to Miscavige, Miscavige routinely involves himself in the Office of Special Affairs' activities, and that Miscavige personally ordered similar Squirrel Buster activities in the past.

Monique filed this underlying lawsuit against Miscavige, Religious Technology Center, Church of Scientology International, and the individual Squirrel Busters who conducted the alleged tortious activity. In her first amended petition, Monique asserts that Relators are (1) directly liable for the Squirrel Busters' activities because they directed the Squirrel Busters to commit the torts and (2) vicariously liable under respondeat-superior, corporate-veil-piercing, and alter-ego theories of liability. Miscavige and Religious Technology Center each filed special appearances in which they assert that they are California residents who do not have meaningful contacts with Texas, and therefore the trial court lacks personal jurisdiction over them.

At the first special-appearance hearing, the trial court ordered limited discovery on the issue of whether the court had personal jurisdiction over the Relators. *See* Tex. R. Civ. P. 120a(1), (3) (allowing party opposing special appearance to conduct jurisdictional discovery). Monique moved to depose Miscavige on the personal-jurisdiction issue. The Relators objected, asserting that under the apex-deposition rule, Monique was required to demonstrate that Miscavige has unique or superior knowledge of facts relevant to personal jurisdiction or, alternatively, that the deposition is reasonably calculated to lead to the discovery of admissible evidence and that less intrusive means of discovery would be insufficient. *See In re Alcatel USA, Inc.*, 11 S.W.3d 173, 175–76 (Tex. 2000)

3

(discussing apex-deposition doctrine). The trial court directed the parties to conduct less intrusive discovery before it would order Miscavige's deposition.

Monique deposed the designated representatives of Religious Technology Center and Church of Scientology International, as well as two Squirrel Buster defendants. Relators responded to some of Monique's document requests and lodged objections to others. Following this initial discovery, the trial court conducted a second hearing on Monique's motion to depose Miscavige and Relators' special-appearance motions. The trial court ordered Miscavige to submit to a deposition on "the jurisdictional issues herein" and granted a continuance on Relators' special appearances. The Relators filed this mandamus petition.

## STANDARD OF REVIEW

To obtain mandamus relief, a relator must show that the trial court clearly abused its discretion and that the relator has no adequate remedy by appeal. *In re Southwestern Bell Tel. Co.*, 226 S.W.3d 400, 403 (Tex. 2007) (citing *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex. 2004)). A clear abuse of discretion occurs when the trial court's decision is so arbitrary and capricious that it amounts to clear error. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992). Mandamus relief is appropriate when a trial court allows an apex deposition to go forward in violation of the standard governing such discovery. *See Alcatel*, 11 S.W.3d at 176.

## DISCUSSION

As a threshold matter, we must determine whether the apex-deposition rule applies to Miscavige in this case. *See In re Taylor*, 401 S.W.3d 69, 72 (Tex. App.—Houston [14th Dist.]

4

2009, orig. proceeding). To resolve this issue, we address two questions of first impression in this Court. Does the apex-deposition rule apply when the deponent is a named party in the suit? If so, how does the rule apply to depositions about the court's personal jurisdiction over the deponent? We will briefly discuss the history and purpose of the apex-deposition rule before determining its applicability to the facts of this case.

**History and purpose of the apex-deposition rule**

Although courts routinely refer to the apex-deposition doctrine as a rule, it has never been promulgated as a discovery rule through the rule-making process. *See Alcatel*, 11 S.W.3d at 181 (Enoch, J., dissenting) (noting that apex-deposition rule was created by judicial fiat). The doctrine evolved from guidelines designed to assist trial courts in determining when rule 192.6 of the Rules of Civil Procedure protects high-ranking corporate officials from unduly burdensome, expensive, or harassing discovery. *See* Tex. R. Civ. P. 192.6(b) (noting that courts may limit discovery to protect moving party from unfair burdens); *see also Alcatel*, 11 S.W.3d at 181 (Enoch, J., dissenting) ("Apex guidelines arose from an evaluation of the existing Rules of Civil Procedure."). The doctrine has arguably become a "*de facto* rule, unavailable to any other potential deponent, that extends a privilege to corporate officials to avoid depositions by virtue of their position." *Alcatel*, 11 S.W.3d at 181 (Enoch, J., dissenting).

The progenitor of the apex-deposition doctrine is *Wal-Mart Stores, Inc. v. Street*, in which a plaintiff sought to depose Sam Walton, then Chairman of the Board of Wal-Mart Stores, Inc., on a "slip-and-fall accident" that occurred in a Texas store. *See* 754 S.W.2d 153, 154–55 (Tex. 1988). In that case, the supreme court reversed the trial court's order requiring Walton's

5

deposition, concluding that Walton was not Wal-Mart's designated corporate representative, the deposition was not likely to lead to discoverable information, and the deposition was overly burdensome. *See Street*, 754 S.W.2d at 154–55. Although the court's opinion did not establish a framework for when depositions of high-level executives are appropriate, the case implicitly acknowledged that apex depositions that are harassing, burdensome, and unlikely to lead to relevant information should be disfavored. *See id.*

Seven years later, the apex-deposition doctrine was thoroughly developed in *Crown Central Petroleum Corp. v. Garcia*, 904 S.W.2d 125, 128 (Tex. 1995). In this landmark opinion, the supreme court sought to balance the deposing party's need to obtain discoverable material with an executive's right to be protected from burdensome, expensive, harassing, and annoying depositions that might invade the executive's personal, constitutional, or property rights. *See id.* at 127. This balancing of interests, the court concluded, supported the creation of the apex-deposition rule, and this same balance of interests informs our analysis of the rule in this case. *See id.* at 127–28.

In *Crown Central*, the court stated that the apex-deposition rule applies "[w]hen a party seeks to depose a corporate president or other high level corporate official." *Id.* at 128. To initiate the apex protections, the party seeking to avoid deposition must move for protection and attach an affidavit from the relevant corporate official denying any knowledge of relevant facts. *See id.* In evaluating the motion for protection, the trial court first determines whether the party seeking the deposition has "*arguably* shown that the official has any unique or superior knowledge of discoverable information." *Id.* (emphasis added). If the party seeking deposition fails to make this initial showing, the court considers whether the party has arguably shown "(1) that there is a

reasonable indication that the official's deposition is calculated to lead to the discovery of admissible evidence, and (2) that the less intrusive methods of discovery are unsatisfactory, insufficient, or inadequate." *Id.*

The supreme court further limited the availability of apex depositions in *In re Alcatel USA, Inc.*, 11 S.W.3d at 177. In that case, the plaintiff alleged that "a plan engineered at the highest level of Samsung's executive structure" led to the theft of the plaintiff's trade secrets. *Id.* at 174–75. The plaintiff sought to depose two of Samsung's highest ranking executives to develop facts relevant to that alleged scheme. The court concluded that evidence tending to show that (1) one of the executives set Samsung's vision, (2) the alleged theft was consistent with the goals of that vision, (3) Samsung had invested significant resources in the project that perpetrated the theft such that the executives must have been familiar with the theft, and (4) the alleged theft "smacks of chairman-level importance" was insufficient to show that the Samsung executives had unique or superior knowledge of discoverable information. *See id.* at 176–77. As the court explained, "many business disputes directly involve the decisions or actions of a high-level officer," but the fact that the high-level officer may have been involved in the relevant dispute does not, standing alone, support the executive's deposition. *Id.* at 180. Although *Alcatel* was decided under the *Crown Central* standard, it extended the apex-deposition doctrine by establishing that allegations and evidence indicating that an apex executive must have known about the complained-of corporate activity is insufficient, in and of itself, to support taking an apex deposition. *See id.*

With these cases in mind, we consider whether the apex-deposition rule applies in this case.

7

**Applicability of apex-deposition rule**

This mandamus petition concerns the application of the apex-deposition rule when the targeted deponent is a named party who has filed a special appearance. We first address whether the rule applies to named parties. Then we will discuss how it applies in the special-appearance context.

*Apex deposition of named party*

To the extent that Monique seeks to depose Miscavige based solely on his role as head of the Church and Chairman of the Board of the Religious Technology Center, the traditional standard for apex depositions would normally apply. *See Crown Cent.*, 904 S.W.2d at 128; *see also In re Doe*, No. 13-10-00590-CV, 2011 WL 1158765, at *1–2 (Tex. App.—Corpus Christi Feb. 10, 2011, orig. proceeding) (mem. op.) (applying apex-deposition rule to regional head of religious organization). However, Miscavige is also a named defendant in this case, and Monique asserts that he is individually liable based both on his own conduct and on principles of vicarious liability. Neither the supreme court nor this Court has ever addressed whether the apex-deposition rule protects named parties.

At least two of our sister courts of appeals have stated that the apex-deposition doctrine does not apply when the deponent is a named party. *See In re Titus Cnty.*, 412 S.W.3d 28, 35 (Tex. App.—Texarkana 2013, orig. proceeding) ("[T]he apex doctrine does not protect named parties from deposition."); *Simon v. Bridewell*, 950 S.W.2d 439, 443 (Tex. App.—Waco 1997, orig. proceeding) (per curiam). However, neither of these opinions analyzes why apex protections are unavailable to named parties, and both opinions primarily rely on an analysis of whether the depositions were being sought "'because of [the deponent's] corporate position.'" *Titus Cnty.*,

8

412 S.W.3d at 35 (quoting *Simon*, 950 S.W.2d at 442). Although these cases offer some guidance, their analysis falls short of providing a reasoned justification for concluding that the apex-deposition rule does not protect named parties.

Intuitively, one might assume that if an executive is a named party from whom the plaintiff seeks relief, then the plaintiff should automatically be entitled to take the executive's deposition in order to develop facts necessary to establish liability.[3] But the Texas Rules of Civil Procedure do not distinguish between depositions of named parties and depositions of other individuals. *See* Tex. R. Civ. P. 199.1(a) ("Generally [a] party may take the testimony of any person or entity by deposition on oral examination . . . ."). Conversely, there is an equally intuitive concern that a plaintiff could include a high-level executive as a named defendant merely to circumvent the apex-deposition doctrine, thereby obtaining the type of harassing and coercive deposition that the doctrine was designed to prevent. *See, e.g.*, *Doe*, 2011 WL 1158765, at *3 (concluding trial court could reasonably have determined that plaintiff named bishop as defendant to circumvent apex-deposition rule). Therefore, we must consider whether the purpose of the apex-deposition doctrine supports its application to named parties.

The apex-deposition rule becomes a potential issue only when an executive's corporate position bears some relationship to the underlying information the deposing party seeks. *See Titus Cnty.*, 412 S.W.3d at 34–35 (concluding apex-deposition rule did not apply when county sought executive's deposition based on his status as landowner); *Simon*, 950 S.W.2d at 442 (noting

---

[3] We refer to an executive seeking to avoid deposition as a defendant because that is the posture of the parties in this case.

9

executive's apex status must be relevant to deposition for doctrine to apply). For example, if a party sought to depose the CEO of General Motors based on some alleged design flaw in a vehicle, then the deposition relates to her status as CEO, and the apex-deposition rule would be implicated. *See Street*, 754 S.W.2d at 154–55. However, if a plaintiff sought to depose the same CEO because she witnessed a car accident, then her status as CEO would be irrelevant to the deposition, and the plaintiff would be entitled to take the CEO's deposition as if she were any other eyewitness. *See Simon*, 950 S.W.2d at 442.

We conclude that this same principle is applicable to depositions of named parties who hold apex positions. If a high-level executive is named as a defendant based on some dispute that is unrelated to his status as an executive, then the plaintiff has a right to obtain the executive's deposition just as he or she would any other party. For example, in *In re Titus County*, the Texarkana Court of Appeals considered whether a landowner involved in a condemnation proceeding could avoid deposition because he was a corporate executive. 412 S.W.3d at 34–35. The court correctly concluded that a landowner was not protected by the apex-deposition rule because the deposition did not relate to his corporate position and was being sought based only on his status as a landowner. *See id.* If an executive is sued based on an alleged tort, contract dispute, or other theory of liability that does not arise from actions he took in his capacity as an executive, then the executive is subject to deposition just as any other individual would be.

Conversely, we conclude that if an apex executive is named as a defendant based on his capacity as an executive, then the apex doctrine is implicated and the *Crown Central* standard

should be applied to a request for his deposition.[4] Having concluded that the apex-deposition rule potentially protects named parties in these circumstances,[5] we next consider how the rule operates when the party seeking to avoid deposition files a special appearance.

*Apex deposition for special appearances*

In another issue of first impression, we must determine how the apex-deposition rule applies in the context of the limited discovery allowed under the Texas Rules of Civil Procedure concerning an apex-deponent's special appearance. In this case, Miscavige filed a special appearance asserting that the trial court lacks personal jurisdiction over him because he is a California resident with insufficient minimum contacts in Texas. *See* Tex. R. Civ. P. 120a (allowing party to file special appearance challenging trial court's jurisdiction). As required by the Rules of Civil Procedure, the trial court limited discovery to facts relating to Miscavige's special appearance. *See id.* 120a(2) (requiring court to hear and determine special appearance before any other motion). Therefore, at this stage of the proceedings, Monique is entitled only to information relevant to the personal-jurisdiction issue, and we must determine how the apex-deposition rule applies given this limited scope of

---

[4] This conclusion is consistent with the balancing of interests underlying *Crown Central Petroleum Corp. v. Garcia*'s analysis. *See* 904 S.W.2d 125, 128 (Tex. 1995). Furthermore, the supreme court has stated that even when a high-level executive has knowledge of the challenged corporate activity, that does not support an inference that the executive has unique or superior knowledge of relevant facts or that less intrusive means of discovery are insufficient. *See In re Alcatel USA, Inc.*, 11 S.W.3d 173, 177 (Tex. 2000); *see also In re Daisy Mfg.*, 17 S.W.3d 654, 659 (Tex. 2000) (per curiam) ("[A]llegations that [CEO] had 'access' to information and that he was the final policy authority, alone, does not satisfy *Crown Central*'s standard.").

[5] Similarly, a party who sues a high-level executive based on allegations of vicarious liability—either through veil-piercing or respondeat-superior theories—may not depose the executive without a particularized showing that the *Crown Central* standard has been satisfied. *See Crown Cent.*, 904 S.W.2d at 128.

11

discovery. *See id.* 120a(3) (allowing party opposing special appearance to conduct limited discovery "essential to justify his opposition").

Texas courts may exercise jurisdiction over a nonresident if the Texas long-arm statute authorizes the exercise of personal jurisdiction and the exercise of jurisdiction is consistent with federal and state constitutional guarantees of due process. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007); *see also* Tex. Civ. Prac. & Rem. Code § 17.042. The Texas Supreme Court has interpreted the broad language of the Texas long-arm statute to extend Texas courts' personal jurisdiction "as far as the federal constitutional requirements of due process will allow." *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002).

A nonresident's contacts with Texas may give rise to two types of personal jurisdiction—general jurisdiction and specific jurisdiction. *Id.* General jurisdiction is established when a nonresident defendant's contacts with Texas are "continuous and systematic," regardless of whether the alleged liability arises from those contacts. *Id.* at 796. In contrast, specific jurisdiction focuses on "the relationship among the defendant, the forum and the litigation." *Moki Mac*, 221 S.W.3d at 575–76. "Specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum." *BMC Software*, 83 S.W.3d at 796. For a Texas court to properly exercise specific jurisdiction, (1) the defendant must have made minimum contacts with Texas by purposefully availing himself of the privilege of conducting activities here and (2) the defendant's contacts with Texas must be substantially connected to the operative facts of the litigation. *See Moki Mac*, 221 S.W.3d at 585.

12

Whether a trial court has personal jurisdiction over a defendant is a question of law. *Id.* at 574. The plaintiff has the initial burden of pleading allegations sufficient to bring the nonresident defendant within the provisions of the Texas long-arm statute. *BMC Software*, 83 S.W.3d at 793. A defendant challenging a Texas court's personal jurisdiction must negate all jurisdictional bases alleged. *Id.* The defendant may negate jurisdiction on a legal basis by showing that even if the plaintiff's allegations are true, they do not establish jurisdiction. *Kelly v. General Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). A defendant may also negate jurisdiction on a factual basis by introducing evidence that rebuts the allegations in the pleadings. *Id.* Though we generally take pleadings as true when considering whether the plaintiff has properly invoked the trial court's jurisdiction, the pleadings merely create a presumption that can be rebutted and overcome by evidence submitted on the issue. *Id.* With this framework in mind, we consider how the apex-deposition rule applies to discovery about the trial court's personal jurisdiction over an apex deponent.

This Court has never applied the apex-deposition rule in the special-appearance context. However, in *Moncrief Oil International, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 157–58 (Tex. 2013), the supreme court recently addressed whether a plaintiff was entitled to take additional depositions of two corporate executives concerning their corporation's special appearance. In that case, the court concluded that the trial court did not err in denying the plaintiff's motions to compel the depositions because the record indicated that the executives' testimony would be cumulative of other discovered information and the plaintiff had "not identified what additional testimony the depositions of the [additional executives] would provide regarding Texas contacts . . . ." *Id.* at 158.

13

Although *Moncrief* did not involve the apex-deposition doctrine specifically, it establishes the general principle that special-appearance depositions are justified only when the plaintiff can identify some additional, non-cumulative information that is relevant to the jurisdictional inquiry which the deposition is likely to produce. *See id.* This same concern that unnecessary and overly burdensome depositions should be avoided is at the core of the apex-deposition rule. *See Crown Cent.*, 904 S.W.2d at 127–28. Therefore, the same balance of interests supports applying the apex-deposition rule in the special-appearance context. *See id.* at 127. Before an apex deposition will be allowed in the special-appearance context, the plaintiff has the burden to show either (1) that the apex deponent has some unique or superior knowledge of facts relevant to personal jurisdiction or (2) that the deposition of the executive is reasonably calculated to lead to discoverable information about personal jurisdiction and less intrusive means of discovery are unsatisfactory, insufficient, or inadequate. *Id.* at 128.

Having already concluded that the apex-deposition doctrine applies to a named party who is being sued based on his capacity as a corporate officer, we consider whether the trial court erred in ordering Miscavige's deposition in this case.

**Analysis of apex-deposition rule in this case**

All of Monique's claims against Miscavige relate to actions Miscavige allegedly took in his capacity as head of the Church. Therefore, the apex-deposition rule applies in this case even though Miscavige is a named party. Thus, in order to satisfy the *Crown Central* standard, Monique must show that arguably (1) Miscavige has some unique or superior knowledge of facts that are relevant to personal jurisdiction or (2) Miscavige's deposition is reasonably calculated to lead to

14

discoverable information about personal jurisdiction and less intrusive means of discovery are unsatisfactory, insufficient, or inadequate. *Id.*

The trial court appears to have attempted to apply an apex-deposition analysis before ordering Miscavige's deposition. After Relators argued for application of the apex-deposition rule, the trial court did permit some initial, less intrusive discovery on personal jurisdiction, including depositions of corporate representatives and written discovery. Following Monique's second motion to compel, the court ordered Miscavige's deposition based on the court's concern that "we would be back here with an argument somehow or another that [less intrusive discovery is] not sufficient." Based on this record, we conclude that the trial court did apply the apex-deposition rule before ordering Miscavige's deposition. We therefore consider only whether the trial court erred in its application of the apex-deposition rule.

Monique's pleadings assert that the trial court has both general and specific jurisdiction over Miscavige. Monique also asserts that the Squirrel Busters' and Church of Scientology International's Texas contacts may be imputed to Miscavige. We consider whether the record supports taking Miscavige's deposition on general jurisdiction, specific jurisdiction, and imputed contacts separately.

*General jurisdiction*

With respect to general jurisdiction, the pleadings assert that Miscavige has "a substantial connection with Texas due to [his] continuing and systematic contact purposefully directed toward Texas." Miscavige attached a signed declaration to his special appearance in which he asserts that he is a California resident, that he has never lived or conducted business in Texas,

15

and that he has only visited Texas once in the past twenty-five years to attend the opening of the Church of Scientology of Dallas. This declaration is supported by the deposition of Warren McShane—Religious Technology Center's president—who testified that based on his knowledge of Miscavige's travel schedule and communication logs, Miscavige does not have continuous or systematic contacts with Texas.

Monique has neither pleaded facts nor introduced evidence that would indicate that Miscavige has had continuous or systematic contacts with Texas. *See BMC Software*, 83 S.W.3d at 797–98 (discussing "onerous burden" for proving general jurisdiction). Furthermore, she has not asserted that deposing Miscavige could arguably reveal any additional continuous or systematic contacts with Texas. *See Moncrief*, 414 S.W.3d at 157–58 (noting special-appearance deposition only appropriate if not cumulative of other evidence).

Based on the record before us, Monique has failed to demonstrate that Miscavige has unique or superior knowledge of facts relevant to his continuous and systematic contacts with Texas. Furthermore, Monique has not demonstrated that deposing Miscavige is likely to lead to information relevant to general jurisdiction which is not obtainable through less intrusive means. Therefore, based on this record, the *Crown Central* standard does not support taking Miscavige's apex deposition with respect to general jurisdiction at this time.

*Specific jurisdiction*

For the trial court to exercise specific jurisdiction over Miscavige, "there must be a substantial connection between" Miscavige's contacts in Texas "and the operative facts of the litigation." *Moki Mac*, 221 S.W.3d at 585. Therefore, whether the record supports deposing

16

Miscavige on specific jurisdiction necessarily involves consideration of the factual basis for his alleged liability, the relationship between that liability and his Texas contacts, and whether developing facts relevant to those connections supports taking an apex deposition. *See id.*; *BMC Software*, 83 S.W.3d at 797–98 (analyzing whether alleged fraud and negligent misrepresentation were committed in whole or in part in Texas). If Monique can show that—consistent with the apex-deposition rule—taking Miscavige's deposition is necessary to establish a substantial connection between Miscavige's contacts with Texas and the operative facts of Monique's claims, then an apex deposition would be appropriate.

Monique asserts that Miscavige is directly liable because he ordered the Office of Special Affairs and the Squirrel Busters to commit the alleged tortious activity. *See Ennis v. Loiseau*, 164 S.W.3d 698, 707–08 (Tex. App.—Austin 2005, no pet.) ("A corporate officer may not escape liability where he had direct, personal participation in the . . . challenged corporate activity."). According to Monique, the Squirrel Busters' tortious activity was directed at the Rathbuns in their Texas home. However, to support taking Miscavige's deposition based on her claims, Monique must satisfy the *Crown Central* standard outlined above. *See* 904 S.W.2d at 128. Thus, Monique must show that arguably (1) Miscavige has some unique or superior knowledge of facts relevant to whether he directed the Squirrel Busters' activities or, alternatively, (2) there is a reasonable indication that Miscavige's deposition is calculated to lead to the discovery of admissible evidence and less intrusive means of discovery are insufficient. As the supreme court stated in *Alcatel*, the mere fact that an apex executive had direct knowledge of the alleged corporate wrongdoing does not support an inference that the executive has unique or superior knowledge of relevant facts. *See* 11 S.W.3d at 177. Although Monique alleges that Miscavige ordered the Squirrel

17

Busters to commit the alleged torts, she has produced no evidence of this fact or any evidence from discovery that Miscavige has unique or superior knowledge in this regard. *See id.* Therefore, Monique must rely on the second *Crown Central* prong—showing that Miscavige arguably has discoverable information and that less intrusive means of discovery are insufficient.

Monique conducted some initial discovery with respect to personal jurisdiction, including depositions of the Squirrel Busters and the Religious Technology Center and Church of Scientology International's corporate representatives. However, Monique neither asked the deponents whether Miscavige ordered the Squirrel Busters' activity nor inquired in any detail about Miscavige's role in their activities. Furthermore, Monique did not move to compel the Religious Technology Center to produce copies of Relators' communications with the Squirrel Busters or other Church officials about the Rathbuns. Instead, Monique asserts that the deponents lied in their depositions in order to protect Miscavige, and therefore less intrusive means of discovery would not be effective. Given that Monique failed to ask the deponents obvious questions relevant to Miscavige's involvement in this case, has not sought additional written discovery, and has not sought to compel discovery of relevant documents, we conclude that Monique has not arguably shown that less intrusive means of discovery would be unsatisfactory, insufficient, or inadequate. *See id.* at 178. Therefore, the record does not support ordering Miscavige's deposition for specific jurisdiction as it relates to Monique's direct-liability claims.

*Imputed contacts*

Monique also asserts that Miscavige is vicariously liable for the Squirrel Busters' and the Church of Scientology International's tortious activities. Specifically, Monique claims that

18

the Squirrel Busters and the Church of Scientology International are Miscavige's agents and therefore Miscavige is vicariously liable for their activities based on principles of respondeat superior. Similarly, Monique argues that the Church of Scientology International is the alter ego of Miscavige and thus its actions should be considered Miscavige's actions. According to Monique, these theories of vicarious liability support the trial court's exercise of personal jurisdiction over Miscavige because both the Squirrel Busters' and Church of Scientology International's Texas contacts can be imputed to Miscavige. Once again, there is no evidence in the record to indicate that Miscavige has unique or superior knowledge of facts relevant to these vicarious-liability claims, and therefore Monique must rely on the second *Crown Central* prong to support taking Miscavige's deposition. *See id.*

An agent's contacts with Texas may be imputed to a principal if the plaintiff produces some evidence that the agent had the actual or apparent authority to act on behalf of the principal. *See Schlais v. Valores Corporativos Softtek, S.A. de C.V.*, No. 03-11-00188-CV, 2012 WL 1499488, at *10–11 (Tex. App.—Austin Apr. 25, 2012, no pet.) (mem. op.) (discussing burden of proof for imputing agent's contacts to principal). However, Monique has not shown that less intrusive means of discovery—such as additional depositions, depositions on written questions, interrogatories, or written discovery—would be insufficient to prove that either the Squirrel Busters or the Church of Scientology International had the actual or apparent authority to act on behalf of Miscavige. Therefore, Monique has not established that taking Miscavige's deposition is necessary to prove her vicarious-liability theory of specific jurisdiction.

Similarly, Monique has not shown that she is entitled to take Miscavige's deposition based on her "alter-ego" claim. For jurisdictional purposes, in order to "fuse" the Texas contacts of

19

a parent company with that of a subsidiary or agent, a plaintiff must prove that "the parent controls the internal business operations of and affairs of the subsidiary." *BMC Software*, 83 S.W.3d at 799. "But the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice." *Id.* Monique has not demonstrated that Miscavige has unique or superior knowledge of facts relevant to his control over the Church of Scientology International nor has she shown that less intrusive means of discovery would be insufficient to prove that level of control. Thus, Monique has not demonstrated that taking Miscavige's apex deposition is appropriate to prove her alter-ego theory of specific jurisdiction.

Therefore, we conclude that the record does not support taking Miscavige's apex deposition on any of Monique's theories of vicarious liability. Having concluded that the record also does not support taking Miscavige's deposition on general or specific jurisdiction, we conclude that the trial court clearly abused its discretion in ordering Miscavige's deposition. We note that after attempting additional, less intrusive discovery, Monique may be able to demonstrate that taking Miscavige's deposition is necessary to develop facts relevant to Relators' special appearances. However, at this time, the *Crown Central* standard has not been satisfied and thus the trial court erred in ordering this apex deposition.[6]

---

[6] Given our conclusion that the trial court erred in ordering Miscavige's deposition based on the apex-deposition rule, we need not reach Relators' alternative argument that compelling Miscavige's deposition violates Miscavige's constitutional right to the free exercise of religion. *See* U.S. Const. amend. I.

**Hearing on special appearance**

In addition to challenging the trial court's order requiring Miscavige's deposition, the Relators also seek an order from this Court compelling the trial court to conduct a hearing on their special appearances. We construe this as an argument that the trial court erred in granting Monique a continuance to conduct additional jurisdictional discovery.

Rule 120(a) of the Rules of Civil Procedure governs jurisdictional discovery. It states that "[t]he court shall determine the special appearance on the basis of the pleadings, any stipulations made between the parties, such affidavits and attachments as may be filed by the parties, the results of the discovery process, and any oral testimony." Tex. R. Civ. P. 120a(3). The trial court may order a continuance to permit the party opposing the special appearance to obtain affidavits or depositions "essential to justify his opposition." *Id.* This Court will not disturb a trial court's order granting or denying a motion for continuance unless the trial court has committed a clear abuse of discretion. *See BMC Software*, 83 S.W.3d at 800; *In re Stern*, 321 S.W.3d 828, 838-39 (Tex. App.—Houston [1st Dist.] 2010, orig. proceeding).

In this case, the trial court granted Monique's motion for continuance in order to allow her the opportunity to depose Miscavige. We have concluded that the trial court erred in ordering Miscavige's deposition based on the apex-deposition doctrine. However, our conclusion does not foreclose the possibility that additional, less intrusive means of discovery may be sufficient to develop facts relevant to the court's personal jurisdiction over Miscavige. We express no opinion about whether additional jurisdictional discovery is appropriate at this time.

21

The trial court may, in its discretion, conclude that Monique is entitled to additional discovery in order to justify her opposition to Relators' special appearances. *See Stern*, 321 S.W.3d at 839 (noting that plain language of Tex. R. Civ. P. 120a(3) authorizes discovery prior to ruling on special appearance). Based on this record, we cannot say that the trial court clearly abused its discretion in granting Monique's motion for continuance. Therefore, we will not order the trial court to conduct a hearing on Relators' special appearances at this time. We deny Relators' request for an order compelling the trial court to conduct a hearing on Relators' special appearances.

## CONCLUSION

Having concluded that the apex-deposition rule applies to Miscavige and that the record does not support taking Miscavige's apex deposition at this time, we conclude that the trial court clearly abused its discretion in ordering Miscavige's deposition. Accordingly, we conditionally grant Relators' mandamus petition in part and order the trial court to withdraw its order compelling Miscavige's deposition. We deny all other requested relief. If the trial court fails to comply, we will issue the writ.

_____

Scott K. Field, Justice

Before Justices Puryear, Goodwin, and Field

Filed:   July 17, 2014

22