**In re SOUTHWESTERN BELL TELEPHONE COMPANY, L.P., Relator.**

No. 05–0511.

Supreme Court of Texas.

Argued March 22, 2006.

Decided June 1, 2007.

James A. Baker, Weston C. Loegering, Stanford Purser, Hughes & Luce, LLP, Kara Lea Altenbaumer–Price, Dallas, Robert Patrick Rodriguez, Eduardo R. Rodriguez, Rodriguez, Colvin, Chaney & Saenz, L.L.P., Brownsville, Cynthia F. Malone, SBC Texas Legal Department, Pamela St. John, Southwestern Bell Telephone, San Antonio, Mike A. Hatchell, Locke Liddell & Sapp, LLP, Austin, Geoffrey M. Klineberg, Kellogg Huber Hansen Todd & Evans, PLLC, Scott H. Angstreich, Kellog, Huber, Hansen, Todd, Evans & Figel, PLLC, Washington, DC, for Relator.

Timothy J. Herman, Sean E. Breen, Herman, Howry & Breen, L.L.P., Mark Foster, Foster & Hunter, Christopher Malish, Foster Malish Blair & Cowan, Austin, Gilberto Hinojosa, Magallanes Hinojosa & Mancias, Brownsville, for Real Parties in Interest.

John R. Hulme, Natural Resources Division, Austin, for Amicus Curiae.

Justice JOHNSON delivered the opinion of the Court.

The issue in this case is whether the Public Utility Commission has primary jurisdiction to resolve threshold questions about the meaning and effect of certain telephone interconnection agreements between Southwestern Bell Telephone Company and the plaintiff local exchange telephone service carriers. We conclude that it does, and conditionally grant mandamus relief.

## I. Background

In 1996, Congress opened local telephone service to competition by enacting the Federal Telecommunications Act (FTA). Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56. Telephone companies that provide local calling services are referred to as local exchange carriers or LECs. Certain LECs such as relator Southwestern Bell Telephone Company historically held a monopoly in providing the services and are referred to as incumbent LECs or ILECs. *Sw. Bell Tel. Co. v. Pub. Util. Comm'n,* 208 F.3d 475, 477 (5th Cir.2000). Historically, the ILECs owned extensive telecommunication networks. *AT & T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999) (noting that ILECs "owned, among other things, the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the

transport trunks (wires carrying calls between switches) that constitute a local exchange network"). LECs such as plaintiffs in the trial court, who are real parties in interest here, compete with ILECs and are called competitive local exchange carriers (CLECs). The FTA requires each ILEC to share its network with competitors. *Sw. Bell Tel. Co.*, 208 F.3d at 477. The FTA allows a CLEC to access an ILEC's network in three ways: by purchasing local telephone services at wholesale rates for resale to end users; by leasing elements of the incumbent's network on an unbundled basis; and by interconnecting its own facilities with the ILEC's network. *AT & T Corp.*, 525 U.S. at 371, 119 S.Ct. 721.

Under the FTA, interconnection agreements must be approved by the Public Utility Commission (PUC). *See* 47 U.S.C. § 252(e) (2001). CLECs may, but need not, separately negotiate contracts with the ILEC. If a CLEC chooses not to separately negotiate a contract, the FTA also allows it to adopt (1) an existing agreement that any other CLEC has entered into with the ILEC, or (2) a standard-form "T2A" agreement developed by Southwestern Bell and other CLECs. If parties cannot reach an agreement when negotiating the terms of an interconnection agreement, then either party can ask the PUC to arbitrate the unresolved issues. *See* 47 U.S.C. §§ 252(b), (c).

Each of the CLEC plaintiffs in this case contracted with Southwestern Bell by adopting either the T2A agreement or an existing previously negotiated agreement. The interconnection agreements entered into by the parties provided that Southwestern Bell would charge the plaintiff

CLECs between $5.00 and $25.00 for certain services.

After the plaintiffs and Southwestern Bell entered into their interconnection agreements, the PUC conducted two arbitrations to set rates for other CLECs' interconnection agreements when those CLECs were unable to agree on negotiated prices with Southwestern Bell. Those proceedings are referred to as the "Mega–Arb" and "AccuTel"[1] arbitrations. In the Mega–Arb and AccuTel proceedings the PUC set rates for certain services to be supplied by Southwestern Bell at prices between $2.56 and $5.00. The plaintiffs in this case had contracted to pay between $5.00 and $25.00 for the same services.

Following the PUC's decisions in the Mega–Arb and AccuTel proceedings, the plaintiffs brought suit, asserting that Southwestern Bell had been overcharging them because the rates in their contracts were substantially higher than the rates set in the Mega–Arb and AccuTel arbitration proceedings. The causes of action asserted by plaintiffs include (1) Deceptive Trade Practices Act (DTPA)[2] violations, (2) unjust enrichment/money had and received, (3) violations of Texas anti-trust laws, and (4) fraud.

Southwestern Bell removed the suit to federal court, but the federal court remanded the case. The plaintiffs and Southwestern Bell both moved for summary judgment in state court. In the alternative, Southwestern Bell also sought referral to the PUC on the basis that the PUC had primary jurisdiction to decide threshold issues regarding the interconnection agreements. The motions were denied. Southwestern Bell then sought, but was denied, mandamus relief from the Thirteenth Court of Appeals. Southwest-

---

1. AccuTel was originally a plaintiff in the underlying proceeding in this case. The trial court severed AccuTel's claim.

2. Tex. Bus. & Com.Code §§ 17.41–63.

ern Bell now requests this Court to issue a writ of mandamus directing the trial court to (1) refer the issues regarding the interconnection agreements to the PUC and (2) abate the case while the PUC reviews the issues referred. The PUC has filed an amicus brief in support of Southwestern Bell's position.

## II. Mandamus Standards

In order to obtain mandamus relief a relator must show that the trial court clearly abused its discretion and that the relator has no adequate remedy by appeal. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex.2004). A trial court abuses its discretion if it fails to analyze or apply the law correctly. *In re Kuntz*, 124 S.W.3d 179, 181 (Tex.2003). An adequate remedy by appeal does not exist under circumstances such as those presented by this matter if trial is erroneously permitted to go forward because allowing the trial to proceed would interfere with the important legislatively mandated function and purpose of the PUC. *In re Entergy Corp.*, 142 S.W.3d 316, 321 (Tex. 2004); *see also State v. Sewell*, 487 S.W.2d 716, 719 (Tex.1972) (noting the importance of administrative agencies and concluding that the judicial system should avoid improper restraints on administrative proceedings).

## III. Analysis—Primary Jurisdiction

Southwestern Bell argues that referral to the PUC and abatement of the suit is required because the PUC has primary jurisdiction over questions regarding interpretation and enforceability of the parties' interconnection agreements. We agree.[3]

Primary jurisdiction "allocate[s] power between courts and agencies when both have authority to make initial determinations in a dispute." *Subaru of Am. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 221 (Tex.2002). Trial courts should defer to appropriate administrative agencies when (1) the agency is staffed with experts trained in handling complex problems within the agency's purview, and (2) great benefit is derived from the agency's uniform interpretation of laws within its purview and the agency's rules and regulations when courts and juries might reach differing results under similar fact situations. *Id.* Both requirements are met in this case.

The PUC is staffed with experts who routinely consider the validity and enforceability of interconnection agreements. In addition to approving the interconnection agreements in the first instance, the PUC also retains authority to interpret and enforce the interconnection agreements when disputes arise about their meaning or effect. *Sw. Bell Tel. Co. v. Pub. Util. Comm'n*, 208 F.3d 475, 479–80 (5th Cir. 2000) ("[T]he [FTA's] grant to the state commissions of plenary authority to approve or disapprove these interconnection agreements necessarily carries with it the authority to interpret and enforce the provisions of agreements that state commissions have approved."). State commissions have been said to act as "deputized federal regulators" under the FTA and have developed expertise in enforcing and interpreting the requirements of the FTA. *MCI Telecomms. Corp. v. Illinois Bell Tel. Co.*, 222 F.3d 323, 344 (7th Cir.2000).

In addition to the PUC's having expertise in interpreting interconnection agree-

---

3. Southwestern Bell also argues that abatement and referral to the PUC is warranted because the PUC has exclusive jurisdiction over threshold issues. Because Southwestern Bell seeks only abatement and not dismissal of the case, we decide the case based on primary jurisdiction and do not reach the question of exclusive jurisdiction.

ments, its uniform interpretation of the agreements provides great benefit. Conflicting jury verdicts and rulings by different courts in regard to same or similar situations and fact patterns could result in disparate treatment of the CLECs and ILEC. Disparate treatment of companies and lack of uniform decisions regarding contractual obligations could inhibit competition, compromise the PUC's ability to perform its regulatory duties under the FTA, and frustrate Congress's goal of providing opportunity for competition in the local-calling market. *See* H.R. REP. No. 104–458, at 113 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124 (noting that Congress enacted the FTA to promote competition in all telecommunications markets, including the local service market). Furthermore, many CLECs have identical interconnection agreements because the FTA allows each CLEC to adopt an agreement that another CLEC has entered into with the ILEC. *See* 47 U.S.C. § 252(I) (2001). Given Congress's intent to promote competition and standardize the interconnection agreements, there is considerable benefit in obtaining uniform interpretation of those agreements. *See Subaru of Am.,* 84 S.W.3d at 221.

Plaintiff CLECs assert that the PUC lacks primary jurisdiction in this case because it lacks the power to adjudicate the plaintiffs' tort, DTPA, and antitrust claims. We disagree. Although the PUC cannot grant all the relief that the plaintiffs request, the PUC is authorized to make initial determinations regarding the validity of the interconnection agreements and their interpretation. We have held that "when the primary jurisdiction doctrine requires a trial court to defer to an agency to make an initial determination, the court should abate the lawsuit and suspend finally adjudicating the claim until the agency has an opportunity to act on the matter." *Butnaru v. Ford Motor Co.,* 84 S.W.3d

198, 208 (Tex.2002). Once the PUC has made its determinations regarding the interconnection agreements, then the trial court may proceed with its adjudicative function.

Plaintiffs further assert that referring the case to the PUC will provide no benefit because the previous arbitration proceedings resolved the question of what rates Southwestern Bell is authorized to charge. Again, we disagree. The arbitration decisions set rates for the future in situations where other CLECs and the ILEC could not agree between themselves what those rates should be. The proceedings did not address the validity and enforceability of different rates between parties who agreed upon those different rates.

We therefore conclude that the PUC has primary jurisdiction over questions regarding the validity and enforceability of the interconnection agreements.

### IV. Analysis—Waiver

■ Plaintiff CLECs contend that mandamus relief is not warranted in this case because Southwestern Bell (1) waited too long to seek a hearing on primary jurisdiction, and (2) waited too long before pursuing mandamus relief after the trial court refused to abate the case. Plaintiffs rely primarily on *Rivercenter Assocs. v. Rivera,* 858 S.W.2d 366, 367 (Tex.1993). In *Rivercenter,* we held that "[a]lthough mandamus is not an equitable remedy, its issuance is largely controlled by equitable principles," and one such principle is that "'[e]quity aids the diligent and not those who slumber on their rights.'" *Id.* (quoting *Callahan v. Giles,* 137 Tex. 571, 155 S.W.2d 793, 795 (1941)). In that case, Rivercenter sought mandamus relief to quash a jury trial demand because the parties had contractually agreed to waive a jury. We held that relief was not appropriate when

Rivercenter was sent notice on the day the jury demand was filed, yet for no apparent reason delayed filing its motion to quash for over four months.

We disagree for two reasons. First, the record in this case does not reflect unexplained delay in asserting the primary jurisdiction issue. Southwestern Bell raised the issue in federal court, then raised it again in the state trial court on April 25, 2003—less than a month after the federal court remanded the case.

Second, the CLECs do not contend that Southwestern Bell substantially invoked the litigation process to the CLECs' prejudice. *In re Vesta Ins. Group, Inc.*, 192 S.W.3d 759, 763 (Tex.2006). And, delay alone does not generally establish waiver. *Id.* Southwestern Bell filed, on September 13, 2004, its separate motion for summary judgment, or in the alternative, motion to defer to the PUC based on primary jurisdiction.[4] The trial court heard argument on the motion on December 2, 2004 and orally denied it at that time. The trial court entered a written order on April 18, 2005. Southwestern Bell filed its petition for writ of mandamus in the court of appeals less than one month later. These facts do not present a situation in which Southwestern Bell failed to timely assert the issue of primary jurisdiction or is barred by prejudicial delay from asserting that the PUC has primary jurisdiction. *See id.* To the contrary, Southwestern Bell raised the issue of primary jurisdiction promptly, sought a hearing within the timeframe set by the scheduling order, and sought mandamus relief soon after its motion was denied.

### V. Conclusion

We hold that the trial court abused its discretion in refusing to abate the case to allow the PUC to exercise its primary jurisdiction. We further hold that (1) permitting trial to go forward before the PUC completes its exercise of primary jurisdiction would interfere with the important legislatively mandated function and purpose of the PUC in the construct established by the FTA, and (2) there is no adequate remedy by appeal if trial proceeds before the PUC completes exercise of its primary jurisdiction.

Accordingly, we conditionally grant mandamus relief. The trial court is directed to abate the case and proceed in accordance with this opinion. We are confident that the trial court will comply; the writ will issue only if it fails to do so.

---

4. The mandamus record does not contain the trial court's scheduling order. However, Southwestern Bell asserts, and the CLECs do not dispute, that Southwestern Bell filed its motion in accordance with the trial court's scheduling order.