# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00036-CV

---

**In re Christi Ovchinnikov Barker**

---

### ORIGINAL PROCEEDING FROM WILLIAMSON COUNTY

---

## M E M O R A N D U M   O P I N I O N

Christi Ovchinnikov Barker[1] seeks a writ of mandamus compelling the district court to "overrule" its temporary orders in a suit affecting the parent-child relationship. *See* Tex. Gov't Code § 22.221; Tex. R. App. P. 52.1. In a single issue, Christi alleges that the district court "abused its discretion by issuing a temporary order changing the designation of the party with the right to designate the primary residence of the children without sufficient evidence that each child's present circumstances would significantly impair their physical health or emotional development." Because we agree that the district court abused its discretion by changing the parent with the exclusive right to designate the primary residence of their three children from Christi to her ex-husband, Glen, *see* Tex. Fam. Code § 156.006(b)(1) (prohibiting, as relevant here, trial court from rendering temporary orders changing person with exclusive right to designate children's primary residence unless temporary order is in children's best interest and

---

[1] Because the relator and the real party in interest share a surname, we will use given names.

"the order is necessary because the child[ren]'s present circumstances would significantly impair the child[ren]'s physical health or emotional development"), we will conditionally grant in part the petition for writ of mandamus, *see* Tex. R. App. P. 52.8(c) (allowing Court to grant relief without hearing argument), and instruct the district court to vacate the provision naming Glen as the parent with the right to designate the children's primary residence. Because Christi has not briefed us on the other provisions in the temporary orders, we do not reach those provisions. *See* Tex. R. App. P. 47.1; 52.8(d).

## BACKGROUND

Glen and Christi divorced in Utah in 2016. There are three children of the marriage—Henry, William, and Brett. The divorce decree awarded Christi "primary physical custody of the three children subject to [Glen's] right to parent-time at reasonable times and places."

Henry is the oldest—eleven at the time of the hearing on the temporary orders— and, according to Christi—has certain textural aversions that she attributes to attention-deficit hyperactivity disorder (ADHD) and possible autism. She has him enrolled in special-education services and occupational therapy to try to address these issues, and Henry has sometimes taken prescription medication for ADHD. William is the middle child—nine at the time of the hearing—and, according to Christi, is dyslexic and has a history of allergies to gluten, dairy, and food dyes. Christi has, at times, placed William and his siblings on an "elimination diet" to prevent William from ingesting these foods. Like Henry, William is enrolled in special-education services at school. Brett is the youngest—six at the time of the hearing—and, according to school and dietician records, has a history of overeating and incontinence. He began school in 2020.

2

In 2018, after a suit for modification resulted in a mediated agreement, the Utah court with continuing, exclusive jurisdiction over the children issued an order allowing Christi to move with the children to the Austin, Texas, area and indicating that "due to this move, [Christi] shall have sole physical custody [and] the parties shall continue to have joint legal custody." Since then, Christi has resided with the children in the Austin area, and Glen has had visitation for several weeks during each summer vacation and during the winter holidays.

During his December 2019 visitation, Glen thought the children appeared underweight and became concerned about the children's well-being, seeking out an evaluation from Dr. John Taylor, a pediatrician, who echoed Glen's concerns about the children's weight and filed a report with protective services. A case was opened but ultimately dismissed without investigation. Glen then filed, in the Utah court with presumed continuing, exclusive jurisdiction over the children, a motion for temporary restraining order and injunction, a motion for temporary orders, and a verified petition to modify the 2018 order to change the parent with the right to designate the children's residence. Glen's pleadings complained, inter alia, that Christi had not paid for travel expenses, had failed to facilitate Glen's electronic communication with the children, had not listed Glen as an emergency contact on school records, and had malnourished the children. The Utah court initially granted the temporary restraining order, but ultimately dissolved that restraining order after holding a hearing on the requested injunction and finding no threat of irreparable harm.

Christi eventually challenged the Utah court's jurisdiction over the children, and in July of 2020, that court determined that it no longer had continuing, exclusive jurisdiction over the children. The court explained, "The Court determines while there is some evidence in Utah, the Court finds that neither the children and [sic] one parent have a significant connection

with this state, and the substantial evidence concerning the children's care, protection, training, and personal relationships is to be found primarily in Texas and that Texas is the more appropriate forum regarding custody and parent time issues." The court then dismissed the proceedings after concluding, "Any modification sought by the parties should be pursued in Texas."

While Christi's jurisdictional challenge was still pending in Utah, she filed an Original Petition in Suit Affecting the Parent-Child Relationship Seeking Modification of Out-of-State Order in Williamson County district court. Her petition sought to modify the Utah court's 2018 order to conform to the Texas Standard Possession Order and to make certain other changes to the order. In response to Christi's petition, Glen filed a Counterpetition to Modify the Parent-Child Relationship and Request for Temporary Orders, seeking essentially the same relief he had sought from the Utah court. In relevant part, his counterpetition requested temporary orders changing the designation of the party with the right to designate the primary residence of the children, as well as modifications to other provisions not at issue in this original proceeding.

**HEARING AND TEMPORARY ORDERS**

The district court held a hearing on Glen's request for temporary orders on December 21, 2020, while the children were in Utah for winter visitation. Four witnesses testified at the hearing: Glen, as the party seeking the temporary orders; Ms. Amelia Davidson, a dietician retained by Glen; Dr. Taylor, as the pediatrician retained by Glen; and Christi, as the party opposed to the requested orders. The children, all under the age of twelve at the time of the hearing, did not testify at the hearing or meet with the presiding judge in chambers. *Cf.* Tex. Fam. Code § 156.006(b)(3) (allowing change where "child is 12 years of age or older and has

4

expressed to the court in chambers as . . . the name of the person who is the child's preference").
The district court also admitted dozens of exhibits offered by the parties.

Glen testified first and claimed that reassignment of the parent with the right to designate the primary residence is necessary because the children "keep losing weight on a regular basis and each time they're with" Christi. He alleged that Christi keeps all food locked in a pantry and is "shopping for diagnoses" as a pretext for depriving the children of food and "to get financial gain." He elaborated on his reasons for seeking the orders:

> We noticed they kept getting a lot skinnier. I had known for a long time that she's restricted certain things from their diet which they didn't seem to have any trouble digesting. They never showed any signs of issues with those foods and they just continued to drop weight at a significant rate to the point that they were in the very low percentiles of their weight and I couldn't stand by and wait till it read zero.

He continued:

> They would take food [when with Glen] and go hide with it and go hide under the bed or in closets to eat food and near the end of visits they would stop doing that because they know that they're safe to eat whatever they want to eat but they would do that a lot. They also would always ask, "What's in this? What's in that?" They had a lot of food aversions where they were afraid to eat certain things and so it was very concerning to me.

He indicated that he'd had the children tested by a professional and that "they're not allergic to anything." He said there had been two reports filed with child-protective services agencies but conceded that "they were both dismissed."

When asked if he saw behavioral concerns when the children were with him, he responded in the negative, saying, "not at all." When asked if he believed Christi's claims that Henry has ADHD or autism, he conceded the physician's diagnosis of ADHD but continued:

5

> It is not my position that he doesn't have it but I disagree—I have an issue with the process that was taken where I was not involved to make that decision and I think that both parents should have been part of that diagnosis and I was not allowed to do so.

He complained that getting any information about the children's health or education is a "constant battle." He also complained that the children typically appear "in their underwear" during their videoconferences and that he had repeatedly heard Christi "screaming profanities" at the children during these calls. Glen reported that Christi "has a pattern of lying . . . and keeping, withholding information where it makes it hard for [them] to be coparents." He concluded by testifying that the children would easily transition to life with Glen in Utah because Glen has a "good community" and "extended family" there, but he admitted that the children would live with a 17-year-old step-sibling with a history of "suicidal ideation."

Davidson testified next and indicated that she had met with the children in June and July of 2020. She explained that "based off of his BMI-z score,[2] [Henry] was diagnosed with moderate malnutrition non-illness related." "The other two," she said, "were not able to diagnose based off of their Z score with malnutrition." She explained that she "did not do any testing" for food allergies or perform a physical examination of the children. She recalled that "Henry made the comment that he was worried he didn't have enough food [upon returning to Texas] and he was worried that he would not gain weight," but that William had said "he had no concerns," and Brett "didn't mention any concerns." She then explained the potential long-term ramifications of undernourishment, including "not being able to reach their maximum growth capacity and [issues] with brain development." When asked if she had a "treatment plan" for Henry's malnutrition, she responded, "My recommendations are that he has adequate intake to

---

[2] Davidson did not explain this metric.

support his energy needs," and said he would likely gain weight without intervention. She refused "to speculate" as to whether any of the children would develop a "clinical eating disorder" if they remained in Christi's care. She noted, "[T]here is no evidence that shows that doing a gluten free or dairy free is harmful to a child, provided that they are getting adequate energy intake to support their growth and development from other nutrient sources." She then conceded that she had not seen or spoken with the children since they had returned to Texas six months earlier.

Dr. Taylor testified that his clinic had seen the children in the summer and December of 2019 and again during the summer of 2020. He said that Henry's weight was "below the 1st percentile" at both 2019 visits but acknowledged that Henry presented with "a complicated medical history" that might make it difficult for Henry to gain weight. He testified that William had dropped from the 50th to the 9th percentile over the course of those six months. When asked to recount the boys' progress during Glen's possession during the summer of 2020, Dr. Taylor responded:

> William . . . got 56 in June, 59, 62, 65 and 68 by end of the summer so yes, a steady weight gain in William. Henry over the summer he was 50.49, 51, 52, 54, 53 towards the end so less significant but some weight gain. Brett doesn't seem to have any problem gaining weight, he gained quiet [sic] a bit of weight, 47, 51, 52, 53, 54.

He stated that he "didn't have any concerns" until one of the children, without prompting, said they are "always hungry in Texas." When presented with evidence that the children had lost weight after returning to Texas following the summer of 2020, he responded, "[I]t's concerning." Dr. Taylor then explained the potential long-term health implications of chronic undernourishment.

Christi then testified as to when she first started restricting the children's diet:

> [I]t would have to go back when William was about two, he was a lot smaller than Henry at the time and during that time is when we did like an elimination diet with the help of professionals to take different foods out of his diet and see what would help. We eliminated at that time gluten and dairy and he sprouted right up. When Henry was five he was still crapping in his pants, he was still having a hard time with the whole potty training thing at five and that was a great concern so we took him to Brain Balance[3] and at Brain Balance they did an assessment that showed academically he was very gifted, very talented, but socially and emotionally he was two years behind development wise so we enrolled him in that program of occupational therapy.

She then explained that she consulted a gastroenterologist and dietician who "worked in conjunction together" to help with the children's issues, and that with the help of the occupational therapist, they were able to discontinue the "elimination diet" in October of 2019. When asked if she keeps the pantry locked, she responded, "Yes, that's where I keep all the medication is in the pantry, it does not lock away all the food." She continued, "I have a fridge, a second freezer, I have a baskets [sic] full of snacks and the two older ones know how to cook minimal things." When asked her "personal view with regards to the children's weight," she responded, "I personally was as skinny as Henry so it feels like a lot of it is genetic." She mentioned his textural aversions but said she has seen "some improvement" and emphasized that she is "always encouraging him to eat." With respect to Brett, she said they were teaching him "to listen to his body" to curtail the overeating.

Exhibits admitted by the district court include:

- The clerk's record of the proceedings in Utah.

- A recording of the hearing in Utah in which the court was "very concern[ed]" about the children's "very low weight" but denied Glen's request for a temporary injunction.

---

[3] Christi did not explain what Brain Balance is.

8

- A copy of a child-services report from Utah reflecting that a case was opened in June of 2020 but closed on suspicion of a "false report." It is not clear who made the report. The record does not appear to include a copy of the results of the report made by Dr. Taylor in 2019.

- An audiorecording that Glen made during a videoconference with the children, while they were in Texas, of Christi complaining that one child had just had an accident in the bathroom and that someone would have to "clean up shit." Also in the recording, another child is heard asking for a cinnamon roll and is told that it will "make [him] sick." Christi is also heard threatening to take "all devices away" if the children do not start behaving.

- A set of text messages between a number labeled "CPS" and Christi. The exchange includes photos of each of the children and the caseworker's request to meet with Christi.

- A set of text messages between "Rolando" and Christi. It is not clear who "Rolando" is, but the context suggests he is a caseworker of some kind. The exchange includes photos of each of the children, of each of their rooms, and of a well-stocked refrigerator, freezer, and "snack drawer," as well as confirmation that "Rolando" had conducted an in-home visit at Christi's residence.

- An email in which Christi outlines all the food restrictions and recommends foods "the kids like" for their step-mother.

- A text exchange between Glen and Christi in which Glen proclaims that the kids "don't need drugs—they need a parent who loves them all the time . . . and your [sic] not it."

- A text exchange in December of 2019, while the children were in Utah, in which Christi expresses frustration that Glen and his new wife are not facilitating the children's videoconferences with Christi.

- Text exchanges in which Glen and Christi discuss the children while they are in his care during the summer of 2020 and Christi expresses concern that the children might not be following their dietary restrictions and frustration that Glen had sought out a new pediatrician in Utah without her knowledge.

- An email exchange in which Glen and Christi each accuse one another of knowingly or negligently allowing their children access to pornography. It is unclear whether the children ever in fact accessed pornography.

- A set of photos showing the children enjoying various recreational activities while with Glen in Utah.

- The children's medical records from their pediatricians and specialists in Austin.

- The children's medical records from the pediatrician in Utah.

- Special-education records reflecting the individualized plans for William and Henry.

- Academic records from the Hutto ISD reflecting that William and Henry had transferred from Round Rock to Hutto in 2020 and that Brett had enrolled there, as well.

At the close of the hearing, the district court recited the governing standard and then explained, "I will tell you that I am extremely concerned about these boys." It continued, "I'm concerned about their physical development, their emotional development and the eating issues." The court then asked when, absent the court's intervention, the children would return to Christi, and counsel responded that they would return on January 3, 2021. The court then announced it would take the matter under advisement and render a decision by December 31.

On December 22, the district court issued temporary orders providing that:

GLEN BARKER is appointed the temporary sole managing conservator of the children.

CHRISTI OVCHINNIKOV BARKER['s] access to the children is limited to occurring in the state of Utah within the city limits of the city of GLEN BARKER's residence. The visitation will take place on one weekend per month, beginning on the Saturday following the first Friday of the month at 9:00 a.m. and ending at 5:00 p.m. that same day and on the following Sunday beginning at 9:00 a.m. and ending at 3:00 p.m. that same day.

The parties shall agree to the appointment of one professional to conduct a child custody evaluation regarding the circumstances and condition of the children, the parties, and the residence of any person requesting conservatorship of, possession of, or access to the children and any other issue or question relating to the suit at the request of the Court before or during the evaluation process.

The parties shall confer and agree to the provider to conduct a psychological evaluation on CHRISTI OVCHINNIKOV BARKER.

CHRISTI OVCHINNIKOV BARKER shall pay guideline child support for the children, including the payment of the cost of medical and dental insurance.

The parties shall each pay 50% of the uninsured medical expenses. GLEN BARKERS [sic] shall child support obligation shall cease.

10

If the parties are unable to agree on the provider to conduct the child custody evaluation or the provider to conduct the psychological evaluation, Mr. Barker shall choose three possible providers to conduct the child custody evaluation and three providers to conduct the psychological evaluations. Ms. Barker will make the final selection from the providers chosen by Mr. Barker.

CHRISTI OVCHINNIKOV BARKER is immediately and temporarily enjoined from the following:

    a. Violating the Children's Bill of Rights.

    b. Disturbing the children or GLEN BARKER or interfering in any way with GLEN BARKER's possession of the children by taking or attempting to take possession of the children, directly or through any other person, from the residence, school, or any other place.

    c. Hiding or secreting the children from GLEN BARKER.

    d. Making disparaging remarks regarding GLEN BARKER or his wife in the presence or within the hearing of the children.

    e. Discussing any litigation concerning the children in the presence or within the hearing of the children.

The court concluded its order by indicating that any relief requested by Christi was denied. The district court subsequently filed findings of fact and conclusions of law, including finding 74, which indicates, "This order is necessary because the children's present circumstances would significantly impair the children's physical health or emotional development."

Christi then filed this petition for writ of mandamus, complaining of the provision changing the parent with the right to designate the children's primary residence and specifically challenging the characterization of circumstances reflected in finding 74. She also filed a motion asking us to stay the temporary orders pending the outcome of this mandamus action.

11

**DISCUSSION**

In a single issue, Christi contends she is entitled to mandamus relief because the district court committed a clear abuse of discretion by issuing temporary orders that changed the designation of the conservator with the exclusive right to designate the primary residence of the children in absence of evidence to support its finding of a risk of significant impairment of the children's physical health or emotional development under the present circumstances. *See id.* § 156.006(b)(1). We agree.

A writ of mandamus will issue to correct a clear abuse of a trial court's discretion when the party has no adequate remedy by appeal. *In re Southwestern Bell Tel. Co.*, 226 S.W.3d 400, 403 (Tex. 2007) (orig. proceeding); *In re Serio*, No. 03-14-00786-CV, 2014 WL 7458735, at *1 (Tex. App.—Austin Dec. 23, 2014, orig. proceeding) (mem. op.). Mandamus is an appropriate vehicle for challenging temporary orders because these orders are not appealable. *See In re Derzapf*, 219 S.W.3d 327, 334–35 (Tex. 2007) (orig. proceeding) (per curiam); *In re Coker*, No. 03-17-00862-CV, 2018 WL 700033, at *3 (Tex. App.—Austin Jan. 23, 2018, orig. proceeding) (mem. op.). "Findings and conclusions may be helpful in reviewing for an abuse of discretion, but do not carry the same weight as findings made after a trial on the merits and are not binding when we are reviewing a trial court's exercise of discretion." *Jenkins v. Transdel Corp.*, No. 03-04-00033-CV, 2004 WL 1404364, at *1 (Tex. App.—Austin June 24, 2004, no pet.) (mem. op.) (citing *Tom James of Dall., Inc. v. Cobb*, 109 S.W.3d 877, 884 (Tex. App.—Dallas 2003, no pet.)).

Under Section 156.006, the trial court "may not render a temporary order" that changes which parent has the exclusive right to designate the primary residence of the children unless the temporary order is in the children's best interest, and, as relevant here, "the order is

necessary because the child[ren]'s present circumstances would significantly impair the child[ren]'s physical health or emotional development." *See* Tex. Fam. Code § 156.006(b)(1). "Texas courts have recognized that the 'significant impairment' standard in [S]ection 156.006(b)(1) is a high one." *Serio*, 2014 WL 7458735, at *1. The standard requires the movant to present evidence of "serious acts or omissions" that suggest that, if the children were to remain in present circumstances, their physical health or emotional development would be significantly impaired. *Id*. at *2. "Serious acts or omissions committed against the child[ren]" are acts "more grave than violation of a divorce decree or alienation of a child from a parent." *Id*.; *see also Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990) (interpreting prior version of Section 156.102, which allowed appointment of nonparent as managing conservator only if "the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child[ren]'s physical health or emotional development"); *In re Ostrofsky*, 112 S.W.3d 925, 930 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding) (analyzing *Lewelling* and other cases interpreting similar language when interpreting Section 156.006 and concluding that Section 156.006 requires evidence of serious acts and omissions by nonmovant parent that would result in significant impairment).

Moreover, Section 156.006(b) requires evidence of the children's *present* circumstances—not past circumstances—and evidence that remaining in those circumstances during the pendency of the custody proceedings would significantly impair their physical or emotional development. *See, e.g.*, *In re Clayborn*, No. 02-12-00299-CV, 2012 WL 3631243, at *3 (Tex. App.—Fort Worth Aug. 24, 2012, orig. proceeding) (mem. op.) (per curiam) (holding study completed years before hearing "is not evidence . . . of present circumstances"); *In re Rather*, No. 14-11-00924-CV, 2011 WL 6141677, at *2 (Tex. App.—Houston [14th Dist.]

13

Dec. 8, 2011, orig. proceeding) (mem. op.) (per curiam) (holding evidence of conditions in mother's prior home insufficient evidence of child's present circumstances). Similarly, mere conjecture about what might happen is not evidence of a risk of significant impairment posed by the children's present circumstances. *See, e.g.*, *Clayborn*, 2012 WL 3631243, at *3 (holding testimony that child might become depressed "nothing more than conjecture about what may happen in the future" and no evidence of present circumstances); *Rather*, 2011 WL 6141677, at *2 (holding father's stated concerns about mother's lack of support if her current relationship failed did not constitute evidence of child's present circumstances).

This Court has addressed the Section 156.006(b) standard in several recent cases. In *In re Serio*, the Court found that although a trial court determined that Serio had tried to alienate the children from the father and prevent them from having an ongoing relationship with him, the record did not contain evidence of serious acts or omissions sufficient to support a finding that the children's emotional development, in their present circumstances, would be significantly impaired. *See* 2014 WL 7458735, at *1–2. Similarly, in *In re Charles*, we determined that evidence regarding the mother's interference with the father's visitation and communications with the child, the child's hygiene, and a "bad case of scabies," which allegedly occurred about eight months before the modification petition was filed, did not rise to the level of "significant impairment." *See* 2017 WL 5985524, at *4. In *In re Coker*, we concluded that allegations of limiting communications and an inconsistent schedule for the children "at best support[ed] implied findings that Coker sought to alienate the children from their father or that she occasionally did not properly supervise the children, which would not be sufficient to satisfy the [significant impairment] standard." *See* 2018 WL 700033, at *5. Likewise, the children's desire not to move, the distance of the new home from the father, and an adult sibling's

testimony that it was important for the children to be near their siblings did not rise to the level of evidence of acts more grave than a violation of the divorce decree or alienation of the children from their parents. *Id*. at *6. In *In re Rusch*, in addition to concluding that the allegations concerning the children's hygiene and dental care, the mother's supervision of the children, and the size of the home did not constitute evidence of significant impairment, we determined that the general concern expressed by the father and the trial court about the impact of the mother's recent marriage and the addition of four new step-siblings on the children's emotional development was also not enough to show a risk of significant impairment. *See* No. 03-18-00163-CV, 2018 WL 2123384, at *7 (Tex. App.—Austin May 9, 2018, orig. proceeding) (mem. op.). And in *In re Tindell*, we concluded that a father's complaints of the mother's possible psychological issues and concerns that the child was "malnourished" and "underweight" insufficient to support a temporary order reassigning the parent with the right to name the child's primary residence. *See* No. 03-18-00274-CV, 2018 WL 3405035, at *5 (Tex. App.—Austin July 12, 2018, orig. proceeding) (mem. op).

As in these recent cases, and in light of the high standard required to change the parent with the right to designate the primary residence at a temporary-orders proceeding, we conclude that the record does not contain sufficient evidence that maintaining the children's present circumstances with Christi will significantly impair their physical health or emotional development. We recognize that this case is a close call because of the evidence that the children—and Henry in particular—consistently lose weight when in Christi's care; nevertheless, we are bound by the Legislature's express limitation of a trial court's ability to change the parent with the right to determine the child's residency to a narrow set of circumstances. Here, the children had been in, and were still in, Glen's care in Utah at the time of the hearing on

15

temporary orders. Yet the dietician he had retained conceded that she had not examined or had any contact with the children in approximately six months. Her testimony therefore provides no evidence of the "present" risk to the children. *See Rather*, 2011 WL 6141677, at *2; *Clayborn*, 2012 WL 3631243, at *3. Moreover, both she and the pediatrician refused to speculate as to any immediate psychological risk from any food restrictions, emphasizing that any harm would result from long-term food insecurity—not from any factor immediately present pending the outcome of this litigation.

Glen testified as to aberrant behavior he had observed in the children in the past, but that is no evidence of present risk. *See Rather*, 2011 WL 6141677, at *2; *Clayborn*, 2012 WL 3631243, at *3. And he speculated that Christi would continue to withhold certain foods from the children and that such restrictions would ultimately result in physical or psychological issues, testifying:

> If things don't change, those pictures could look worse next time and I won't stand by and let that happen. I'm concerned that they're going to be told that they have issues that they don't have. I'm concerned that she's going to try to get— she's going to try to get assistance from the government for free because—she's trying to push for that so she can get some sort of diagnosis that's going to gain her attention.

But this is little more than pure speculation that is insufficient evidence that the children's present circumstances would significantly impair their physical health or emotional development. *See Clayborn*, 2012 WL 3631243, at *3; *Rather*, 2011 WL 6141677, at *2. Moreover, Glen's speculation is rebutted by testimony from the two professionals—the dietician and pediatrician—who testified that physical and emotional impairment would require "more long term than short term" food restrictions.

16

Finally, Glen testified of Christi's allegedly poor parenting skills. He testified, for example, that Christi does not dress the children well, that they have trouble using the bathroom properly, that she "scream[s] profanities" at them, that she prevents Glen from having a healthy co-parenting relationship, that she seeks out inappropriate medical and educational professionals for the children, and that the children would be better off in his "two-parent family home." He provided hundreds of text messages and dozens of photos as evidence in support of his characterization. But these allegations, even if assumed true, are not sufficient to establish a risk of significant impairment to the children's physical health or emotional development. *See Tindell*, 2018 WL 3405035, at *5 (malnourishment and allegations of non-movant's untreated psychological issues); *Rusch*, 2018 WL 2123384, at *7 (poor hygiene and undesirability of non-movant's house); *Coker*, 2018 WL 700033, at *5 (interference with co-parenting); *Charles*, 2017 WL 5985524, at *4 (poor hygiene and interference with co-parenting); *Serio*, 2014 WL 7458735, at *1–2 (attempted alienation of children from movant).

Because the record offers insufficient evidence that remaining in Christi's care for the pendency of the proceedings will significantly impair the children's physical health or emotional development, we hold that the district court abused its discretion by rendering temporary orders designating Glen as the parent with the exclusive right to designate the children's primary residence. And although we recognize that many of the orders' provisions are interrelated, we note that Christi has not briefed us on those other provisions. We therefore do not reach them. *See* Tex. R. App. P. 47.1; 52.8(d).

## CONCLUSION

Having determined that the district court abused its discretion by changing the designation of Christi as the parent with the exclusive right to designate the primary residence in

its temporary orders, we conditionally grant in part the petition for writ of mandamus. We direct the district court to vacate that portion of the temporary orders designating Glen as the parent with the exclusive right to designate the children's primary residence. We dismiss as moot Christi's motion for temporary relief. The writ will issue only if the district court does not comply with this opinion.

 

_____

Edward Smith, Justice

Before Chief Justice Byrne, Justices Baker and Smith

Filed:   March 4, 2021