# IN THE SUPREME COURT OF TEXAS

No. 19-0777

IN RE CENTERPOINT ENERGY HOUSTON ELECTRIC, LLC, RELATOR

ON PETITION FOR WRIT OF MANDAMUS

CHIEF JUSTICE HECHT, joined by JUSTICE BLACKLOCK, dissenting.

In this wrongful-death and survival action, Plaintiffs allege that their decedent,[1] while rendering aid following a motor vehicle accident, fell onto an electric power line that had been knocked to the ground in the accident and was electrocuted because the operator, CenterPoint Energy Houston Electric, used a wrong-sized fuse in constructing the line. The Public Utility Regulatory Act (PURA) gives the Public Utility Commission (PUC) "exclusive original jurisdiction over the rates, operations, and services of an electric utility".[2] The plurality "agree[s] with CenterPoint that plaintiffs' claims are about CenterPoint's operations, and that the issue of fuse size is one the PUC has exclusive jurisdiction to regulate".[3] Recently, in *Oncor Electric Delivery Co. v. Chaparral Energy LLC*, the Court reaffirmed its long-standing rule that a plaintiff suing on a claim involving issues within an agency's exclusive jurisdiction—such as a utility's

---

[1] Plaintiffs are the decedent Glenn Wood Higgins' surviving spouse and estate administrator, Karen Yvette Higgins; his son, Maxwell Seth Higgins; his daughter, Megan Michelle Higgins; and his father, Tommy Higgins. *See* TEX. CIV. PRAC. & REM. CODE §§ 71.004(a), 71.021(a).

[2] TEX. UTIL. CODE § 32.001(a). PURA does not allow the PUC to regulate municipally owned or regulated utilities. *Id.* § 32.002.

[3] *Ante* at 18 (footnote omitted).

standard of care in particular circumstances—must first exhaust his administrative remedies by applying to the agency to use "its unique expertise to resolve [those] issues".[4] Based on the agency's decision, the plaintiff can then proceed "to establish its claim and obtain relief in the courts."[5]

The plurality refuses to apply that rule in this case. It offers two explanations. One is that Plaintiffs are not, as a matter of happenstance, CenterPoint customers. The plurality reads PURA to impose this nonsensical limit on the PUC's exclusive original jurisdiction by focusing on one word, "whose", notwithstanding other passages and reasons to the contrary. PURA was "enacted to protect *the public interest* inherent in the rates and services of electric utilities",[6] not just customers' interests. The plurality's other explanation for not requiring Plaintiffs to apply to the PUC to determine the standard to which CenterPoint is to be held in selecting fuses is that the PUC has not yet ruled on the issue with sufficient clarity. Of course, if the PUC had already ruled, there would be no reason to require Plaintiffs to ask again; the trial court could simply enforce the PUC's decision. It is precisely because the issue is within the PUC's exclusive original jurisdiction and the PUC has not decided it that the PUC must have the opportunity to do so. In the end, the plurality would judicially amend PURA to give the PUC semi-exclusive original jurisdiction over the rates, operations, and services of an electric utility *affecting its customers* and *on matters already decided*. Otherwise, electric utilities' rates, operations, and services are for judges and juries to decide.

The Legislature intended PURA to "protect the public interest" by establishing a

---

[4] 546 S.W.3d 133, 142 (Tex. 2018) (citing *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 222, 224 (Tex. 2002)).

[5] *Id.*

[6] TEX. UTIL. CODE § 31.001(a) (emphasis added); *In re Entergy Corp.*, 142 S.W.3d 316, 323 (Tex. 2004).

"comprehensive" regulatory system[7] covering "all or virtually all pertinent considerations involving electric utilities operating in Texas."[8] The plurality's decision in this case would carve significant exceptions out of the statutory system, just as the Court's decision last week in *In re Oncor Electric Delivery Co.*[9] did. We recognized many years ago that "jury awards can have an effect akin to regulation."[10] We cited the U.S. Supreme Court's acknowledgment that "regulation can be as effectively exerted through an award of damages as through some form of preventive relief", such as direct, administrative regulation.[11] "The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy."[12] The decisions in this case and in *Oncor* make the PUC's jurisdiction over electric utilities' rates, operations, and services joint with courts, not exclusive.

I respectfully dissent.

# I

Under the rule in *Chaparral Energy*, Plaintiffs must complain to the PUC that CenterPoint violated applicable standards in determining fuse sizes for power lines before they can proceed with their lawsuit. PURA allows such a complaint to be made by an "affected person",[13] defined

---

[7] TEX. UTIL. CODE § 31.001(a).

[8] *Entergy*, 142 S.W.3d at 323.

[9] ___ S.W.3d ___ (Tex. June 25, 2021) (No. 19-0662).

[10] *Moore v. Brunswick Bowling & Billiards Corp.*, 889 S.W.2d 246, 249 (Tex. 1994) (citation omitted).

[11] *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959).

[12] *Id.*

[13] *See* TEX. UTIL. CODE § 15.051(a) ("An affected person may complain to the regulatory authority in writing setting forth an act or omission by a public utility in violation or claimed violation of a law that the regulatory authority has jurisdiction to administer or of an order, ordinance, or rule of the regulatory authority.").

to include "a person whose utility service or rates are affected by a proceeding before [the PUC]".[14]

In the plurality's view, "whose" means that an affected person must *possess* the service and rates at issue in a proceeding.[15] Plaintiffs are not CenterPoint ratepayers. Therefore, the plurality reasons, their service and rates would not be at issue in a proceeding to determine the standard for selecting fuse sizes applicable to CenterPoint; they are not affected persons; and they could not initiate a complaint proceeding against CenterPoint before the PUC.

The plurality focuses on the wrong word. Under PURA,

> "[s]ervice" has its broadest and most inclusive meaning. The term includes any act performed, anything supplied, and any facilities used or supplied by a public utility in the performance of the utility's duties under this title to its patrons, employees, other public utilities, an electric cooperative, *and the public*.[16]

An electric utility's service thus involves duties not only to its patrons but also to the public. And PURA was "enacted to protect *the public interest* inherent" in electric utilities' services.[17] Safe operations are a service an electric utility provides both to its customers and to the general public.

---

[14] *Id.* § 11.003(1)(B). The definition also includes public utilities and electric cooperatives as well as existing and prospective competitors:

> "Affected person" means:
> (A) a public utility or electric cooperative affected by an action of a regulatory authority;
> (B) a person whose utility service or rates are affected by a proceeding before a regulatory authority; or
> (C) a person who:
> (i) is a competitor of a public utility with respect to a service performed by the utility; or
> (ii) wants to enter into competition with a public utility.

*Id.* § 11.003(1).

[15] *Ante* at 12–13.

[16] TEX. UTIL. CODE § 11.003(19) (emphasis added).

[17] *Id.* § 31.001(a) (emphasis added); *In re Entergy Corp.*, 142 S.W.3d 316, 323 (Tex. 2004); *see also* TEX. UTIL. CODE § 14.001 ("The commission has the general power to regulate and supervise the business of each public utility within its jurisdiction and to do anything specifically designated or implied by this title that is necessary and convenient to the exercise of that power and jurisdiction."); *id.* § 15.023(c)(1)(B) (authorizing the PUC to impose administrative penalties based in part on a "hazard or potential hazard created to the health, safety, or economic welfare of the public"); *id.* § 15.104(a)(2)(c) (granting the PUC authority to issue cease and desist orders to utilities whose conduct "creates an immediate danger to the public safety").

The plurality would hold that a utility's customers can complain that its services are hazardous but noncustomers—who are just as much at risk—cannot. That reading ignores the text and reaches a nonsensical interpretation of the "affected person" definition and of PURA as a whole.

The PUC's procedural rules likewise confirm that "affected persons" are not limited to a utility's customers. The rules define "complainant" as "[a] person, including commission staff or the Office of Public Utility Counsel, who files a complaint intended to initiate a proceeding with the commission regarding any act or omission by . . . any person subject to the commission's jurisdiction."[18] The provision is not an improper enlargement of the statutory text, as the plurality thinks,[19] but rather confirmation of a correct reading of the statute.

The plurality notes that the PUC has entertained complaints from noncustomers. In three proceedings, landowners complained that electric utilities' transmission lines did not comply with PUC orders.[20] The plurality observes that no one in the proceedings argued that the complainants were not affected persons, but that status is necessary to invoke the PUC's jurisdiction, and the PUC should have raised the issue itself if it thought there was a problem.

Oddly, the plurality seems to argue that the landowners were affected persons not because their own electric service was affected but because utility equipment was on their land, and PURA's definition of "service" includes "facilities used or supplied by a public utility".[21] That is

---

[18] 16 TEX. ADMIN. CODE § 22.2(14).

[19] *Ante* at 14 ("Exclusive jurisdiction to adjudicate a claim brought by plaintiffs must come from the Legislature, not the PUC's own procedural rules.").

[20] *See* Tex. Pub. Util. Comm'n, *Complaint of Dan Agan against Entergy Tex., Inc.*, Preliminary Order at 1, Docket No. 46407 (Dec. 1, 2016), 2016 WL 7187571; Tex. Pub. Util. Comm'n, *Complaint of Johnny H. and Eloise Vinson against Oncor Elec. Delivery Co.*, Supplemental Briefing Order at 1, Docket No. 40953 (Apr. 12, 2013), 2013 WL 1736720; Tex. Pub. Util. Comm'n, *Complaint of Cecil R. Atkission and City of Kerrville against Lower Colo. River Auth. Transmission Servs. Corp.*, Joint Amended Complaint at 1–2, Docket No. 39516 (June 30, 2011), 2011 WL 2662858.

[21] *Ante* at 14–15 (quoting TEX. UTIL. CODE § 11.003(19)).

a correct interpretation of "affected person", as demonstrated above, but it is inconsistent with the plurality's limitation of affected persons to ratepayers. The service that the landowners possessed from the utility was the transmission of electricity to others, and they were entitled to complain that it was not in compliance with PUC orders. But the landowners certainly did not possess that service in the same manner that the plurality maintains Plaintiffs must possess a service in order to qualify as "affected persons". The landowners cannot be affected persons if Plaintiffs are not.

The plurality adds two words to PURA's grant to the PUC of "exclusive original jurisdiction over the rates, operations, and services of an electric utility": *affecting customers*. The text does not hint that the PUC can hear complaints about utilities only from utility customers. The omission of an express limitation so significant, so contrary to PURA's concern for public interests, and so lacking in any conceivable rationale cannot have been mere legislative oversight. The plurality's refusal to follow *Chaparral Energy* here, along with the Court's refusal to do so in *Oncor*, is a small matter compared to the limitation the plurality would impose on PURA's entire regulatory scheme in so doing.

## II

In *Chaparral Energy*, the Court held that a plaintiff suing its electric utility for breach of contract by unreasonably delaying the extension of service to two wells was first required to apply to the PUC to determine the utility's obligations under its tariff before it could proceed to litigate its claim for damages in court.[22] The plurality breaks from this precedent. And as with the Court's opinion in *Oncor*, the plurality uses strawmen to justify its actions. "The Legislature has not conferred on the [PUC] any general authority to preside over tort actions", the plurality

---

[22] 546 S.W.3d 133, 142 (Tex. 2018).

pronounces, quoting the PUC.[23] That's absolutely true—but also undisputed and immaterial. "In fact," the plurality continues, "[t]he Commission has repeatedly stated that it does not have statutory authority to generally adjudicate contract claims and torts or award damages."[24] That's equally true, undisputed, and immaterial. "Nothing in PURA gives the PUC 'jurisdiction to administer' the common law."[25] Agreed, and beside the point. The plurality fails to mention that the State as amicus curiae, represented by the Solicitor General, whose views the Court called for, argues forcefully that while the PUC cannot finally adjudicate Plaintiffs' damages claims, it must be given the opportunity to decide threshold issues within its exclusive original jurisdiction. That includes deciding CenterPoint's legal obligations to Plaintiffs, as the Court held in *Chaparral Energy*.[26]

Chaparral asserted its common-law right to recover damages for breach of contract, just as Plaintiffs here assert their common-law right to recover damages for negligence. *Chaparral Energy* applied the Court's long-standing rule that because the PUC has no jurisdiction to adjudicate common-law claims or award damages but has exclusive jurisdiction to resolve predicate issues underlying those claims, the PUC and the court must each exercise its own jurisdiction in a combined, two-step process: first the PUC, then the court. The issue in *Chaparral Energy*, *Oncor*, and the present case is the same: Must issues over which the PUC has exclusive original jurisdiction be resolved by the PUC before the lawsuit can be prosecuted to a conclusion in court?

---

[23] *Ante* at 22 (quoting Tex. Pub. Util. Comm'n, *Complaint of Jaime Leonardo Sloss against AEP Tex. Inc.*, Preliminary Order at 5, Docket No. 50284 (Apr. 17, 2020), 2020 WL 1973315).

[24] *Ante* at 22 (quoting Tex. Pub. Util. Comm'n, *Complaint of Johnny H. and Eloise Vinson against Oncor Delivery Co.*, Amended Preliminary Order at 12, Docket No. 40953 (May 21, 2013)).

[25] *Ante* at 22 (quoting TEX. UTIL. CODE § 16.051(a)).

[26] Brief of the State of Texas as Amicus Curiae 13–14.

The Court answered no in *Oncor*. The plurality answers likewise in the present case, but for different reasons. In *Oncor*, the plaintiff claimed that "Oncor was negligent in the placement of and/or continuing the placement of the service line that ran across [his] property, through trees, to the neighbor" and "should have moved [it] when asked".[27] The Court held that this claim has nothing to do with "the adequate and efficient provision of electrical services."[28] In the present case, Plaintiffs claim "that CenterPoint's line protection scheme was not prudently designed, and that CenterPoint chose and installed an inappropriately sized fuse."[29] The plurality now declares that Plaintiffs' claims "are about CenterPoint's operations, and that the issue of fuse size is one the PUC has exclusive jurisdiction to regulate".[30] So, the *placement* of power lines is not about a utility's operations and services, but the *design* of power lines is. The two cases' companionship seems somewhat strained.

Even though Plaintiffs' claims involve CenterPoint operations over which the PUC has exclusive original jurisdiction, the plurality concludes that Plaintiffs are not required to present their complaints first to the PUC because PURA does not "set out with sufficient clarity the 'standard of conduct' to which CenterPoint Energy would be held"[31] and because the PUC has not yet decided the issue.[32] But that is the very reason Plaintiffs must first go to the PUC. If PURA or a PUC regulation provided a standard for fuse size applicable in the situation, the trial court could

---

[27] Plaintiff's Second Amended Petition 12, *In re Oncor Elec. Delivery Co.*, ___ S.W.3d at ___ (Tex. June 25, 2021) (No. 19-0662) (mandamus record).

[28] *Oncor*, ___ S.W.3d at ___.

[29] *Ante* at 3.

[30] *Ante* at 18 (footnote omitted).

[31] *Ante* at 21.

[32] *Ante* at 18–19 ("[T]here is neither a law administered by the PUC nor a PUC order or rule that regulates fuse size prospectively, so there can be no complaint that CenterPoint violated any such standards in selecting the fuses at issue.").

simply apply it as the court would any statutory or regulatory requirement. The reason for the PUC's exclusive original jurisdiction over electric utility rates, operations, and services is to ensure that issues relating to those matters are resolved consistently within PURA's "pervasive regulatory scheme".[33] The plurality would amend PURA to give the PUC "exclusive original jurisdiction over the rates, operations, and services of an electric utility *on matters already decided*". It may be that the standard for selecting fuses for power lines is no different from the common law's ordinary-care standard, or it may be that the standard should be higher or lower because of the role of fuses in providing electric service, but PURA squarely gives the PUC the exclusive original jurisdiction to resolve the issue.

The plurality states that the common-law standard of care applies to CenterPoint here as it "correctly argued" in the trial court.[34] CenterPoint's argument, the plurality explains, was made "in resisting plaintiffs' claim of negligence per se".[35] It was only in that context that CenterPoint argued "PURA and PUC regulations do not clearly displace its common-law duty to operate as a reasonably prudent electricity distribution company."[36] But a statute may regulate conduct without meeting the strict requirements for negligence per se.[37] CenterPoint did not concede in the trial

---

[33] *In re Entergy Corp.*, 142 S.W.3d 316, 323 (Tex. 2004) (citing *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 223 (Tex. 2002)).

[34] *Ante* at 20.

[35] *Ante* at 20.

[36] *Ante* at 20.

[37] Our decision in *Perry v. S.N.* lays out the multi-factor test for determining whether a statutory violation is negligence per se. 973 S.W.2d 301, 309 (Tex. 1998). Those factors include:

> (1) whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common law duty; (2) whether the statute puts the public on notice by clearly defining the required conduct; (3) whether the statute would impose liability without fault; (4) whether negligence per se would result in ruinous damages disproportionate to the seriousness of the statutory violation, particularly if the liability would fall

9

court the position it advocates here. Even if it did, the extent of the PUC's exclusive original jurisdiction affects the trial court's jurisdiction and is therefore not something parties can concede.[38] Plaintiffs, on the other hand, specifically pleaded in the trial court that CenterPoint has the duties prescribed by "laws and standards found in Texas Utilities Code § 38.001".[39] That provision states in full: "An electric utility and an electric cooperative shall furnish service, instrumentalities, and facilities that are safe, adequate, efficient, and reasonable."[40] This language clearly covers CenterPoint's use of fuses generally. How it applies specifically is plainly within the exclusive original jurisdiction that PURA gives the PUC.

*Chaparral Energy* addressed the same situation. Chaparral and Oncor's contract did not specify when Oncor was to complete the extension of electric service to Chaparral's wells. The common law would imply a requirement that Oncor complete its work within a reasonable time.[41] In that case, as in this one, nothing in PURA or the PUC's regulations prescribed a standard of timely performance in the circumstances presented. But the Court held that the PUC must first have the opportunity to decide whether the common-law standard or some other should apply to Chaparral's claim.

---

on a broad and wide range of collateral wrongdoers; and (5) whether the plaintiff's injury is a direct or indirect result of the violation of the statute.

*Id.*

[38] *See, e.g.*, *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 103 (Tex. 2012) ("Subject matter jurisdiction cannot be waived or conferred by agreement, can be raised at any time, and must be considered by a court sua sponte."). In *Chaparral Energy*, Oncor first asserted on appeal that the PUC's exclusive original jurisdiction deprived the trial court of subject matter jurisdiction. 546 S.W.3d 133, 137 (Tex. 2018).

[39] Plaintiffs' Fourth Amended Original Petition 6.

[40] TEX. UTIL. CODE § 38.001.

[41] *See Hall v. Hall*, 308 S.W.2d 12, 16 (Tex. 1957) ("When the parties omit an express stipulation as to time, it is in accord with human experience and accepted standards of law for us to assume that they meant whatever term of days or years might be reasonable in the light of the circumstances before them at the date of the contract.").

The parties in *Chaparral Energy* did not dispute that "Chaparral's breach-of-contract claim [could not] be resolved without considering and construing Oncor's PUC-approved tariff."[42] The Court cited tariff language:

- requir[ing] Oncor to "use reasonable diligence to comply with the operational and transactional requirements and timelines for provision of Delivery Service";

- requir[ing] the parties to "cooperate in good faith to fulfill all duties, obligations, and rights set forth in [the tariff]";

- provid[ing] that Oncor "will not be liable for any damages . . . occasioned by fluctuations or interruptions" in the delivery of electricity;

- provid[ing] that, unless "mutually agreed to by [Oncor] and [its] Retail Customer," Oncor must provide an "entity requesting Construction Service an estimated completion date and an estimated cost for all charges to be assessed" within "ten Business Days of [Oncor's] receipt of a detailed request" for such information;

- describ[ing] the form of the easement Oncor is entitled to receive for the facilities it constructs; and

- stat[ing] that the tariff's provisions "shall" govern all requests for construction services.[43]

Oncor relied on "these types of tariff provisions", the Court concluded, while "Chaparral reli[ed] on others".[44] Determining how they applied to Chaparral's claim was for the PUC.

CenterPoint argues that Plaintiffs' claims implicate a pro forma provision in its tariff requiring it to "construct, own, operate, and maintain its Delivery System in accordance with Good Utility Practice" as defined by the PUC.[45] The plurality states that "there are no requirements in

---

[42] *Oncor Elec. Delivery Co. v. Chaparral Energy, LLC*, 546 S.W.3d 133, 142 (Tex. 2018).

[43] *Id.*

[44] *Id.*

[45] 16 TEX. ADMIN. CODE § 25.214(d) (pro-forma tariff section 3.2).

11

CenterPoint's tariff that would apply to the issue of fuse size other than a general standard of care, which does not supplant the common-law standard as we have explained."[46] But the tariff provision CenterPoint cites is no more general that the provisions on which Oncor relied in *Chaparral Energy*. The Court held there that what specific standard they prescribed for Oncor's performance of its contract was a matter for the PUC to decide in its exclusive original jurisdiction.[47] In this case, the plurality reaches the opposite conclusion in circumstances not materially different.

*Chaparral Energy* should control the result in this case.

### III

PURA creates a "comprehensive"[48] and "pervasive"[49] regulatory scheme. The Court has long recognized that "jury awards can have an effect akin to regulation."[50] Whatever the ultimate outcome in this case, electric utilities throughout the state will have to decide whether and how to adjust the design of power lines. "Conflicting jury verdicts and rulings by different courts in regard to same or similar situations and fact patterns could result in disparate treatment" of electric utilities and plaintiffs alike.[51] By deferring to the PUC to determine—within its exclusive original jurisdiction over rates, operations, and services—the standards governing a utility's legal obligations for a common-law claim, as the Court did in *Chaparral Energy*, judicial regulation and

---

[46] *Ante* at 23.

[47] *Chaparral Energy*, 546 S.W.3d at 143.

[48] TEX. UTIL. CODE § 31.001(a).

[49] *In re Entergy Corp.*, 142 S.W.3d 316, 323 (Tex. 2004) (citing *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 223 (Tex. 2002)).

[50] *Moore v. Brunswick Bowling & Billiards Corp.*, 889 S.W.2d 246, 249 (Tex. 1994); *see also San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959).

[51] *In re Sw. Bell Tel. Co.*, 226 S.W.3d 400, 404 (Tex. 2007).

the resulting lack of uniformity in the regulatory system is minimized while claimants' rights to redress are fully protected. The plurality's refusal to follow *Chaparral Energy* here, along with the Court's refusal to do so in *Oncor*, are a significant departure from PURA.

The plurality's decision in this case is broader that in *Oncor*. The plurality would hold that a plaintiff in a tort case need not apply to the PUC to decide an issue in a case involving an electric utility's rates, operations, and services if (1) the PUC has not already decided the issue or (2) the PUC has already decided the issue. In other words, the *Chaparral Energy* procedure never applies. Further, by concluding that an "affected person" entitled to complain to the PUC about a utility's operations must be a ratepayer, the plurality would preclude complaints by the general public. This limitation would greatly impact the PUC's regulatory authority.

\*     \*     \*     \*     \*

I respectfully dissent.

_____

Nathan L. Hecht
Chief Justice

**OPINION DELIVERED:** June 30, 2021

13